## PERRY *v.* STATE

[No. 206, September Term, 1963.]

*Decided March 5, 1964.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT, HORNEY and MARBURY, JJ.

*Bernard B. Feikin* and *Jacob D. Hornstein* for appellant.

*Richard M. Pollitt, Special Attorney,* with whom were *Thomas B. Finan, Attorney General,* and *Marvin H. Anderson, State's Attorney for Anne Arundel County,* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

From his conviction by a jury of murder in the second degree, the defendant (Jule Britt Perry) has appealed. The questions on appeal concern: (i) the sufficiency of the evidence to take the case to the jury and to support the finding of a verdict

50

of guilty; (ii) the correctness of the jury instructions; and (iii) the admissibility and exhibition of posthumous photographs of the deceased.

On the afternoon of September 9, 1962, immediately following an amateur baseball game, two of the spectators, Avery Carter and Edison Alonza James, were shot by a third, the defendant, who, according to his own testimony, was wielding a .22 caliber revolver "about as long as a cigarette pack." Carter died as a result of the shooting.

About three years before the day of the killing, the defendant had suffered and been treated for intravascular coagulating of his blood and, as a result of taking an anticoagulant prescribed for his condition, had become a hemophiliac. He had been told by his physician to avoid situations in which he might be bruised or cut. The defendant stressed this illness, implying that because of his condition, he would not ordinarily risk becoming involved in a brawl.

The defendant's version of the events leading up to and occurring at the time of the shooting (which were largely corroborated by his wife, who, with a four-year old son, had accompanied him to the game) is almost altogether different from the account given in court by James, the victim who survived, and others who saw what happened and testified at the trial for the State. In a statement to the police, the defendant said that as he was leaving the ball park "this fellow James * * * started saying what happened before." (The defendant and James had had an altercation about a month before at which time the defendant claims James threatened him with a shotgun but James denied that he had done so.) He also told the police that James' cousin (Avery Carter, the deceased victim) "walked up * * * pulled out a razor [and] thats when I shot him, and James, both of them." In a second statement made later, the defendant added that James "was holding [a] beer bottle by the head and I thought he was going to hit me with it." The defendant claimed that he had armed himself on the day of the shooting because he was afraid of James. He stated that he shot Carter when he was two arm's lengths from him and fired at James when he was three arm's lengths away. The

defendant's wife testified that her husband "backed all the way up to a tree" before he fired the revolver.

On the other hand, the account of the incident given by James in court (which was substantiated by other witnesses to the occurrence) was to the effect that as he was on the way out of the ball park after the game, the defendant called him, and that after he and Carter had walked over to the defendant, he said: "James, you remember the argument we had down in front of your house? * * * Well, it's gonna be settled here." James further testified that "that's when he shot me two times and he turned around and hugged Avery [Carter] and shot him."

A police officer who arrived at the ball park shortly after the shooting said that he found Carter on the ground with his left hand in his pocket. The ambulance driver, who removed Carter from the park, testified that Carter's left hand was in his pocket clutching a closed straight razor.

### (i)

It is axiomatic that the weight to be given to evidence and the believability *vel non* of witnesses are matters for the jury to determine. *Duffin v. State,* 229 Md. 434, 184 A. 2d 624 (1962) ; *Wright v. State,* 222 Md. 242, 159 A. 2d 636 (1960) ; *Judy v. State,* 218 Md. 168, 146 A. 2d 29 (1958). We think it is apparent that the evidence the State produced was enough to take the case to the jury and, if believed by it (as it must have been), was sufficient to support the finding that the defendant was guilty of second degree murder beyond a reasonable doubt.

### (ii)

After all of the evidence was in, a total of thirteen requests for instructions (two were lettered A and B and the others were numbered 1 through 11) were presented by the defendant to the trial court. The exceptions, taken at the conclusion of the charge to the jury on the ground that the charge failed to cover the substance of the requested instructions, were denied. While the court did not give any of the instructions in the exact wording of the requests, it did include the substance of such of those as were appropriate in its advisory instructions to the

jury, and such as were not proper were refused. The requested instruction A, which was apparently intended as a motion for a judgment of acquittal, was properly denied, and the substance of B was included in the charge by the court advising the jury that malice "means done intentionally and without excuse." Likewise, the essence of requested instructions one, two and three, concerning the burden of the State to prove its case against the defendant beyond a reasonable doubt, was fully covered in the instructions.

One of the principal contentions of the defendant is that the court failed to give the jury "explicit instructions with respect to the law of self-defense." On the contrary, we think the instructions on this point were more than was required by the evidence. After explaining to the jury that the burden of proving that he acted in self-defense was on the defendant, the trial judge specified in detail what could and could not lawfully be done by the accused to defend himself from physical injury by an assailant, and then added that "when a person has reasonable grounds to believe, and does believe, that another intends to kill him or to do him serious bodily injury, that person has the right to arm himself with a weapon, such as a gun or knife, in order to defend himself in the event he is attacked or threatened with an attack by such others." The court, however, did not inform the jury, as it properly should have done, that the right to arm one's self was qualified by the proviso that such person should be "one who is not in any sense seeking an encounter." *Gunther v. State,* 228 Md. 404, 409, 179 A. 2d 880 (1962). See also *Bennett v. State,* 230 Md. 562, 567, 188 A. 2d 142 (1963); *Crawford v. State,* 231 Md. 354, 361, 190 A. 2d 538 (1963). The fourth through the eighth and the tenth and eleventh requested instructions (we shall consider the ninth separately), all of which concerned the plea of self-defense, were, with the exception of the seventh and eleventh, included in the jury charges. We think these requests were properly refused because they were not supported by the evidence. *Duffin v. State, supra,* at p. 436; *Bruce v. State,* 218 Md. 87, 97, 145 A. 2d 428 (1958). The seventh requested instruction would have improperly advised the jury that it had a right "to consider the evidence of the violent and dangerous character of

his assailants as known to the defendant in determining the reasonableness of the defendant's apprehension of danger" and in so doing "to also consider the medical testimony * * * as to his physical health and state of mind." There is nothing in the record to show that the defendant knew, or knew of, the deceased victim Carter prior to the shooting. As to the surviving victim James (whom the defendant is not charged with assaulting in this case), there was no evidence that he had a "violent and dangerous character" other than the self-serving statement that the defendant was afraid of him and the controverted evidence of a single altercation between James and the defendant on a prior occasion. We think the evidence in this case was not enough to support a characterization that either Carter or James was a violent and dangerous assailant. Moreover, the fact that the defendant (who was apprehensive of bleeding to death should he be cut or bruised) did not run away when he was approached by the razor-and-bottle-wielding victims could indicate that he did not believe either of them were dangerous. The eleventh requested instruction would also have improperly informed the jury that it should "find [the] defendant not guilty if, on the whole of the evidence, it had a reasonable doubt as to whether or not the defendant had acted in self-defense." The identical wording of this proposed instruction was examined and rejected by us as not being an accurate statement of the law in *Gunther v. State, supra.* We reaffirm what we said there, at pp. 410, 411.[1]

Relying on what was said in the *Gunther* case (at p. 409) that "the right of the defendant to go wherever he legally had a right to go was not abridged by the fact that he might be attacked," the defendant further contends that the trial court committed prejudicial error when it rejected the ninth requested instruction which would also have improperly told the jury that the defendant had an "absolute legal right to attend the baseball game despite any belief that he may have had that

---

1. We may add that in reaffirming what we said in *Gunther v. State,* 228 Md. 404, on this point, we are aware of the casenote, *Burden of Proof of Affirmative Defenses in Criminal Cases,* by David S. Klein, in 24 Md. L. Rev. 78.

he might be attacked." Quoting from 26 Am. Jur., *Homicide,* § 148, we did say in *Gunther* that "no generally recognized rule of law deprives one who expects an attack to be made upon him of going to places where he otherwise has a legal right to go," and we add now what might well have been added then, the first part of the next sentence, reading: "On the contrary he may proceed with his *legitimate* business." [Italics ours.] See also 40 C.J.S., *Homicide,* § 119, and *Wharton's Criminal Law and Procedure,* (Anderson ed.), § 229. We also point out that the right to go where one legally may go is not stated as an unqualified privilege in the cases cited in the *Gunther* case. In *Lett v. State,* 56 So. 5, 6 (Ala. 1911), it was said that it is "undoubtedly true that the defendant, when he went to the gate, had a right to go armed, provided he did so, not for the purpose of aggression." See also *Barnes v. State,* 93 So. 2d 863 (Fla. 1957), and *Torrez v. State,* 204 S. W. 228 (Tex.Cr. 1918). It seems clear to us that the requested instruction was properly refused since there was not included therein a proviso reading "provided he was not in any sense seeking an encounter and was not the aggressor," or language to that effect.

### (iii)

It was not an abuse of discretion for the trial court to admit the posthumous photographs of the deceased victim as evidence and to allow them to be exhibited to the jury during the closing argument of the State. See *Cook v. State,* 225 Md. 603, 608, 171 A. 2d 460 (1961), and cases therein cited. See also *Baldwin v. State,* 226 Md. 409, 411, 174 A. 2d 57 (1961), and Hochheimer, *Crimes and Criminal Procedure* (2nd ed.) §§ 154, 155. The photographs had significant value as evidence. They were used by at least three witnesses to identify the victim and showed the location of his wounds which tended to discredit the defendant's version of the shooting. Certainly, as an examination of them shows, they were not such as would tend to inflame the jury. Cf. *Bagley v. State,* 232 Md. 86, 95, 192 A. 2d 53 (1963).

*Judgment affirmed.*