BARGER *v.* STATE

[No. 411, September Term, 1963.]

558

*Decided July 9, 1964.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT and HORNEY, JJ., and RUTLEDGE, J., Associate Judge of the Fourth Judicial Circuit, specially assigned.

*Ignatius J. Keane,* with whom were *Keane, DePaul & Willoner* and *Glenn B. Harten* on the brief, for appellant.

*Robert L. Karwacki, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *Arthur A. Marshall, Jr.* and *Howard S. Chasanow, State's Attorney* and *Assistant State's Attorney,* respectively, *for Prince George's County,* on the brief, for appellee.

RUTLEDGE, J., by special assignment, delivered the opinion of the Court.

The appellant, Leslie Barger, was indicted for the murder of Henry Koch. A jury found him guilty of murder in the second degree, and the court sentenced him to sixteen years. He appeals from the judgment entered on the verdict.

Henry Koch's wife, Sandra, started consorting with the appellant in May of 1961. Shortly after they began keeping company they concluded that they were in love. Thereafter they saw each other three or four times a week and generally had sexual relations.

Koch did not learn of his wife's affair with the appellant until March 10, 1963. On March 11th Koch went to Barger's apartment. Mrs. Koch phoned Barger to warn him that her husband was on the way over to see him, and while still on the telephone she overheard her husband shout an uncomplimentary epithet to Barger and tell him that if he ever came near his house again he would blow his head off.

On March 19th, Mrs. Koch drove to Barger's apartment to see him. Without her knowledge Koch followed her. After a few minutes, there was a tremendous banging and kicking on the door. Barger refused to open the door. Koch left and went out front and let the air out of all four of the tires on her car and did something to the engine so that it would not start.

On March 28th, Barger and Koch met again at the Enterprise Inn. Mrs. Koch was also there with a friend, Gertrude Laurenson. On this occasion Koch hit Barger on the arm, used the derogatory epithet again and ran out. Mrs. Koch and Mrs. Laurenson then left the restaurant and Barger followed them home in his car. Upon arriving they saw their suitcases and clothes on the porch and found that they were locked out. They were concerned about their children and were about to go with Barger to the police when Koch appeared shouting and brandishing a knife. Mrs. Koch persuaded her husband to give her the knife, and he persuaded or forced her to get out of Barger's car and go into the house. She claims she was thrown to the pavement by her husband. On her way into the house she threw the knife into a window well. Mrs. Koch then ascertained that her two children were all right and came outside and observed her husband with a knife—either the one she had thrown into the window well or another one — leaning in Barger's car, threatening to kill him, and heard him say to Barger that he was not afraid of his damn gun. For more than two years Barger had been carrying a pistol for the reason, he said, that he was in the habit of carrying large sums of money. Unknown

to him, Mrs. Koch had told her husband about the pistol, hoping this knowledge would make him desist from his violent actions.

On March 29th, both of the Kochs, having tentatively agreed to separate, went to consult with the wife's attorney about drawing up an agreement. Angered by the terms of the separation agreement suggested by the attorney, Koch refused to sign. According to Mrs. Koch he "acted like a wild man." Later he returned home with his wife and she threatened to swear out a warrant if he did not leave. He went to consult his lawyer and his minister, and then returned to the house and took his clothes and left.

Finally, after two weeks of separation from her husband, on April 15, 1963, Mrs. Koch and the appellant met at a prearranged place and then drove in her car back to 5502 Cardona Street, the Koch home. A few minutes later they undressed and went to bed, where Mrs. Koch started to read H. G. Wells' Outline of History that Barger had lent her.

About thirty or forty minutes later they heard a tremendous banging on the front door. It was Koch who had come with two witnesses (upon advice of counsel) to obtain evidence for a divorce. Mrs. Koch told Barger: "This is it. There is Henry." Barger reached for his pistol which he had placed on the headboard of the bed. When Koch broke open the locked bedroom door, Barger was standing at the head of the bed. Koch, addressing both of them with the now familiar degrading term, shouted that he had caught them and used other violent language. His wife pleaded with her husband to get out before someone got hurt.

Koch then grabbed his wife and started hitting her in the stomach and chest and Barger told him to leave her alone. Instead, Koch continued yelling: "Look at them. Here they are. I have got them. Come on in and see them." His wife kept begging him to leave. When the witnesses he had brought with him did not come in, Koch picked up his wife and began to move toward Barger. Barger told Koch to put her down but he refused to do it and called both of them vile names. Barger was standing with his back to the window. He fired six shots.

The first one and probably the second hit Mrs. Koch in the shoulder. Mr. Koch carried his wife through the doorway into the hall, walking backwards. When he reached the hall he let go of his wife and slumped against a couch. Mrs. Koch administered first aid. Barger was going to assist but Koch again used an opprobrious epithet. Barger, in the meantime, had called the police or an ambulance. All six bullets struck Koch, and he died shortly afterward.

At the trial Barger described the breaking of the front and bedroom doors, how he picked up his pistol, and stated that he was completely terrified because he was afraid that Koch was going to kill him and Mrs. Koch. He also said he did not shoot until Koch grabbed his wife, that he did not intend to kill Koch, and that he was not aware of shooting at all.

On his death bed Koch advised his minister of what had occurred in the following words: "I broke in on them and Barger let me have it."

The appellant raises two questions on appeal:

1. Whether the trial court erred in instructing the jury to the effect that it must as a matter of law determine whether the defendant was entitled to defend himself under the circumstances, and, if so, further determine whether the defendant had proved by a fair preponderance of the evidence that he had acted in self-defense.

2. Whether the defendant was deprived of a fair and impartial trial by the repeated use in the court's instructions of the word "victim" in referring to the deceased and in refusing to declare a mistrial on the ground that such repeated use was prejudicial.

In its instructions on the law of self-defense, the trial court advised the jury as follows:

> "Now, the defense that has been raised here is basically that of self-defense. Now, what is self-defense? If you were to find that there is self-defense, you would have a right to bring in a verdict of not guilty as to all charges, or if you feel there was this lack of malice in the killing then you can bring in a verdict of manslaughter. Again, I am repeating that

point. But self-defense has been defined whereas the defendant must show three items: One, that he was not the aggressor; two, that he believed that he was in such immediate danger of losing his own life or suffering serious bodily harm that it was necessary to take the life of the deceased to save himself or to save or prevent harm to another; and three, that the circumstances would warrant reasonable grounds for such belief in the mind of a man or ordinary person.

"Now, I have said that you are the judges of the law and the facts. As judges of the law it is going to be up to you to determine whether the defendant, under the circumstances that you have heard, is entitled to use a defense of self-defense. Now, as I stated previously, and I am going to repeat again because I am on this defense phase, the defendant has the burden of producing evidence to support and affirm a defense such as self-defense. This burden must be met by a preponderance of the evidence, and regardless—if upon all the evidence a reasonable doubt exits to his guilt the defendant should be acquitted."

The appellant excepted to that part of the instructions stating that "you are the judges of the law and the facts, [and] as judges of the law it is going to be up to you to determine whether the defendant, under the circumstances that you have heard, is entitled to use a defense of self-defense." The appellant argues that, under Maryland law, he had a right to assert the defense of self-defense, and that he did not forfeit that right under the circumstances in this case because he was the wife's paramour or was found in her bedroom by the husband. The appellant concedes, however, that the burden was on him of establishing self-defense.

This Court has had occasion in several recent cases to consider the law of self-defense under varying circumstances. See *Gunther v. State,* 228 Md. 404, 179 A. 2d 880 (1962); *Bennett v. State,* 230 Md. 562, 188 A. 2d 142 (1963); *Crawford v. State,* 231 Md. 354, 190 A. 2d 538 (1963); *Perry v. State,* 234 Md. 48, 197 A. 2d 833 (1964). But it appears that there

are no Maryland cases concerning the legal status of a paramour in the circumstances of this case.

In 26 Am. Jur., *Homicide*, § 133, it is said:

"The decisions are not in accord as to whether engaging in sexual intercourse with the wife or daughter of another constitutes such provocation as to deprive the wrongdoer of the right of self-defense when assailed by the outraged husband or father. According to one line of authorities, such illicit intercourse is to be considered the provocation of the difficulty which ensues when discovery of it is made by the husband or father, and the wrongdoer cannot lawfully defend himself against the former's violence, but must seek safety in flight. This rule, however, has been variously qualified. It does not apply to a case where the husband knows of his wife's infidelity and lays a trap to catch her paramour, expecting to catch and kill him. Under such circumstances, the paramour does not lose his right of self-defense.

"According to the rule prevailing in other jurisdictions, a husband has no right to kill his wife's paramour, even though he comes on them at the time of the adulterous act; and the paramour may defend himself against a deadly assault by the husband. A like rule has been applied in the case of an attack upon one who entices the wife of another from her home for illicit purposes."

To the same effect see 40 C.J.S., *Homicide*, § 119, p. 992, and the annotation in 18 A.L.R. 1068. See also *Bailey v. Commonwealth*, 104 S. E. 2d 28 (Va. 1958).

It is true that some cases have held that where a husband, without prior knowledge of infidelity, suddenly discovers his wife and her paramour *in flagrante delicto*, and is so provoked into violent passion that he assaults the paramour, the latter cannot plead self-defense if in the ensuing altercation he kills the husband. The theory on which these cases are based is that the paramour, by offering extreme provocation to the husband, cannot be heard to say that the husband was the aggressor. *Dab-*

*ney v. State,* 21 So. 211 (Ala. 1897) ; *Drysdale v. State,* 10 S. E. 358 (Ga. 1889). Since no such case is here presented, we need not express any opinion as to whether or not we think they should be followed. Koch learned of his wife's infidelities more than a month before the fatal shooting, had altercations with his wife and the paramour over the matter, had been actually separated from his wife since March 29th, and came to the home on the night of the shooting upon advice of counsel to obtain evidence for a divorce.

While the jury in criminal cases are the judges of the law as well as the facts, *Giles v. State,* 229 Md. 370, 183 A. 2d 359 (1962), *appeal dism.* 372 U. S. 767 (1963), Maryland Rule 756 b specifically provides that the trial court may, and at the request of the defendant or the State *shall,* give such *advisory* instructions to the jury as may correctly state the applicable law. The trial court, however, declined to perform its function, and instead required the jury to determine without advice whether or not the defendant was entitled to defend himself under the particular facts of this case. This was error and the judgment must therefore be reversed. At the retrial of the case, the lower court, upon the request of either party, should give such advisory instructions as it may determine states the law applicable to the evidence then produced. On the evidence presented at the original trial the jury should have been advised that the defendant was entitled to assert the defense of self-defense.

With respect to the repetitious use of the word "victim" in the instructions to describe the deceased, we are of the opinion that it was not prejudicial.

The appellant gives the definition of "victim" from the Oxford English dictionary (1933) as "a living creature killed and offered as a sacrifice to some deity or supernatural power," or "a person who is put to death or subjected to torture by another; one who suffers severely in body or property through cruel or oppressive treatment." He also cites the case of *People v. Williams,* 17 Cal. 142 (1860), where the Court criticized the use of the word in instructions in a homicide case. On the other hand, the State relies on the definition of "victim" in Webster's New International Dictionary (2nd Ed.), as "a per-

son or living creature injured, destroyed or sacrificed, in pursuit of an object, in the gratification of a passion, at the hands of another person, from disease, accident or the like."

While the Court in *People v. Williams, supra,* criticized the use of the word, such criticism was dicta only and did not constitute the grounds upon which the case was reversed. In a more recent case, *Reeves v. State,* 17 S. E. 2d 299 (Ga. App. 1941), the lower court referred to the prosecuting witness as the victim in an assault case, and the defendant, claiming self-defense, argued that the use of the word prejudiced his case. The Georgia Court held that the use of the word read in the context of the entire instruction advising the jury of the law applicable to self-defense could not be understood by the jury as an expression of opinion by the trial court as to the validity of the defendant's proffered defense.

In the instant case, while the word "victim" may not have been the most desirable word which the trial court could have used and may have been used too often, yet in view of the trial court's entire instruction, we find that the trial court did not err in this regard.

For the reason stated herein, the judgment must be reversed and the case remanded for a new trial.

> *Judgment reversed and case remanded for a new trial; the costs to be paid by the County Commissioners of Prince George's County.*