**Headnote:** *Marquise Holt v. State of Maryland*, No. 1841, Sept. Term, 2016, Opinion by Kenney, J.

**CRIMINAL LAW – MARYLAND RULE 4-215 – DISCHARGE OF COUNSEL –** A request for permission to discharge counsel, triggering the requirements under Rule 4-215(e), is any statement from which a court could conclude reasonably that the defendant may be inclined to discharge counsel. Maryland appellate courts have espoused a broad interpretation of what constitutes such a request: a statement does not need to be in writing or worded in a particular manner; it may come from either the defendant or counsel.

**CRIMINAL LAW – MARYLAND RULE 4-215 – DISCHARGE OF COUNSEL –** A Rule 4-215(e) inquiry is not mandated unless the defendant or counsel indicates that the defendant has the *present intent* to seek a different legal advisor. Here, as in *Garner v. State*, 414 Md. 372 (2010), the last word to the trial court indicated that any desire of the defendant to discharge counsel had expired by the second hearing, where counsel informed the court that the defendant still wanted his representation. By contrast, the last word to the trial courts in *State v. Davis*, 415 Md. 22 (2010) (the defense counsel's statement), and *Williams v. State*, 435 Md. 474 (2013) (the defendant's letter), indicated a desire to discharge counsel.

**CRIMINAL LAW – IMPERFECT SELF-DEFENSE – JURY INSTRUCTION –** Defendant failed to generate a jury instruction on imperfect self-defense because defendant failed to produce "some evidence" to support two elements of imperfect self-defense: (1) that defendant subjectively believed he was in apparent imminent or immediate danger of death or serious bodily harm; and (2) that defendant was a non-aggressor.

Circuit Court for Allegany County
Case No. K-16-17362

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1841

September Term, 2016

_____

MARQUISE HOLT

v.

STATE OF MARYLAND

_____

Leahy,
Shaw Geter,
Kenney, James A., III
  (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Kenney, J.
_____

Filed:  April 5, 2018

When two groups[1] engaged one another in anticipation of a fight, shots were fired, but no one was struck. A jury in the Circuit Court for Allegany County convicted appellant Marquise Holt of two attempted first-degree murders, a first-degree assault, conspiracy, and related crimes for his role in the incident.

Appellant presents two questions for our review:

1. Did the trial court comply with the requirements of Maryland Rule 4-215(e)?

2. Did the trial court err in refusing to instruct the jury on imperfect self-defense?

We answer "yes" to the first question and "no" to the second, and affirm the judgment of the circuit court.

## FACTUAL BACKGROUND

The engagement took place on the evening of March 30, 2016 at the Fort Cumberland Homes ("Homes") in Cumberland, Maryland. Earlier that afternoon, appellant and Nickoli Cakus,[2] while driving near the Homes, encountered Malachi Thornton and Shawn Hamlette. Cakus had had "a problem with [Hamlette] for over a year," and they had physically fought the previous summer. Appellant and Cakus, now joined by appellant's cousin Marcus Brown and another man, exited their cars and approached Malachi and Hamlette. When Hamlette pulled out a gun and pointed it at him, Cakus punched Hamlette. According to Cakus, Malachi was "loud and aggressive,"

---

[1] We will identify the groups as the "Holt group" and the "Thornton group." Malachi and Mikey Thornton are brothers; we will refer to them as Malachi or Mikey in the opinion.

[2] Cakus, who entered into a plea agreement, implicated appellant in the events. Much of the factual background is based on his testimony at trial.

and he had asked Hamlette for his gun. After appellant and Malachi engaged in a fight, Cakus saw Malachi on the ground holding his face.

When Malachi and Hamlette retreated, appellant and Cakus went to a friend's house to socialize. While they were there, appellant told Cakus that someone had been yelling at their girlfriends, both of whom were visiting an apartment in the Homes. He also told Cakus that Mikey Thornton wanted to fight, and commented that he (appellant) had "never been a hard person to find."

Aireana Washington testified that she had been in an apartment at the Homes with Alexis Fischer (appellant's girlfriend), Janay Bristol (Cakus's girlfriend), and Janya Bristol (Janay's sister). While they were there, they heard rumors that there was going to be a fight. A message sent from Washington's Facebook account to Cakus's read, "Mikey said that you and Buck[3] are going to get in. Bruh, where you at because they ain't touching my best friend."[4]

This information left Cakus with the impression that "there was supposed to be a fight" and that Mikey was looking for him and appellant. Appellant and Cakus drove to Brown's house, where two other men, Kesler and Rideout, joined them. According to Cakus, Kesler had a "tiny revolver" with him. Having decided to go to the Homes after it

---

[3] Cakus and Washington testified that "Buck" is appellant's nickname.

[4] Washington testified that Janya Bristol wrote and sent this message. The message was dated March 30, 2016 and timestamped "21:55:24 UTC". UTC is Coordinated Universal Time, which is five hours ahead of EST but four hours ahead of EDT. *See* 15 U.S.C. §§ 260-263.

On March 30, 2016, 21:55:24 UTC was 5:55:24 p.m. EDT. It has been noted that "[f]or most purposes, UTC is considered interchangeable with Greenwich Mean Time (GMT)." https://en.wikipedia.org/wiki/Coordinated_Universal_Time.

2

was dark, they left together in Rideout's vehicle around 8:00 p.m. Despite having seen Kesler with a revolver, Cakus thought the ensuing fight would be weapon-free. Appellant and Brown did not appear to him to be armed when they left Brown's house, but after they arrived at the Homes, Cakus noticed that they both were holding their waists as if they were carrying weapons.

Upon arriving at the Homes and meeting briefly with Fischer, Washington, and the Bristols, the Holt group advanced within the housing complex grounds with appellant and Brown in front, and Cakus, Kesler, and Rideout behind them. As they proceeded, the Thornton group of about six people, including Malachi, Mikey, and Zaira Stubbs, jumped over a fence and ran towards them. Cakus did not know the others.

What followed happened within a span of seconds, and witnesses provided conflicting accounts of what occurred. According to Cakus, members of the Thornton group were armed with, at least, a knife and a baseball bat.[5] And, almost immediately and without any words being exchanged, appellant and Brown pointed handguns at the other group. Cakus saw Brown fire several shots, but he did not see appellant fire any shots.

Two other witnesses testified that at least one person in the Holt group fired on the Thornton group. They disagreed on whether appellant had a gun or was a shooter.

---

[5] Cakus first testified, "When we got to the steps we saw a group of people coming out of the house . . . I saw Malachi who jumped over one of the fences, and they had like baseball [sic] and knives." Later on, he testified, "I saw a knife and a bat," and then clarified, "[o]ne bat."

3

Zaira Stubbs's mother, Tremaina Bullett, testified that she was standing outside on the telephone when she saw Malachi, Mikey, and Stubbs come out of the backdoor to an apartment, hop a fence, and run towards the Holt group; only one of the men in the Holt group had his face covered. She denied that any members of the Thornton group were armed with weapons. When the Thornton group was within four feet of the Holt group, appellant and Brown pointed guns at the Thornton group and both fired several shots. After the shots were fired, everyone scattered.

There were inconsistencies between Bullett's testimony and her prior statements to police regarding whom she saw during the engagement and who fired gunshots. For example, in her prior statements to police and prosecutors, she did not say that appellant pointed or fired a gun. She explained that any inconsistency was because "everything happened so fast," and that she was worried about her daughter.

Zaira Stubbs testified that the Holt group came "out of nowhere" and "just stood there." Only one person in the Holt group had a gun, and it was pointed at her; she heard only one shot. Because the shooter was wearing black and had something covering his face, she did not recognize the person who fired that shot. She did not recall anyone in her group having a baseball bat.

Other witnesses heard shots fired, but did not see who fired them. The police investigation led to the arrest of Cakus on the following morning.

**PROCEDURAL BACKGROUND**

Appellant was indicted on April 21, 2016, and his jury trial was scheduled to begin on July 27, 2016. On July 14, 2016, appellant's private counsel filed a motion to

4

withdraw his appearance. Appended to the motion was a hand-written, signed note from the appellant that read:

> I have decided that I no longer wish you to represent me and I am going to have to discharge you.
>
> Thank you for all you have done.
> And please withdraw your appearance at once
>
> [/S/ Marquise Holt]

At a status hearing on Friday, July 22, 2016 ("the July 22nd hearing"), the motion to withdraw was first discussed without either appellant or his counsel present. On that occasion, a representative of the Public Defender's Office, in addition to advising the court that it would be a problem for a public defender to represent appellant because of conflicts arising from the representation of five other co-defendants in the case and the lack of panel attorneys, stated:

> Your Honor, I could make a proffer as to what [] Mr. Holt's testimony would be concerning [counsel] and the [] financial arrangements, and how he came to sign that letter indicating his desire to discharge him.
>
> [Counsel] got into this case originally quoting a fee of [] 5 thousand dollars. [O]f that fee, approximately [] 3,280 dollars . . . has been paid. This matter was always going to trial. No question about it, Mr. Holt was from Day 1, was going to trial in this matter. Recently, [counsel] has said, since it's going to trial, my fee is going to be 10 thousand dollars rather than 5 thousand dollars.
>
> [Counsel's] performance in this matter has been despicable. He indicated to Mr. Holt that if he didn't receive his 10 thousand dollar fee, then maybe he couldn't put so much time in this matter, and maybe he wouldn't do a very good job at trial. Then the letter issued that Mr. Holt wanted to fire [counsel].
>
> [T]his is a common practice with [counsel]. He gets a client in his office. He quotes a fee. He collects some money. He spends all of trial

5

preparation time trying to squeeze more money out of the Defendant, and when it comes close to trial time he moves to strike his appearance. I believe actually it's very likely unethical.

* * *

[Counsel] went to Mr. Holt and said eh, I want 10 thousand dollars now more, rather than 5 thousand dollars. If I don't get that money, then maybe I won't do a very good job.

The circuit court concluded that it was not "in a situation to answer this question today, in the absence of [counsel] and the absence of Mr. Holt," and stated that it would "address that motion in connection with the status [hearing] on Tuesday [July 26, 2016], because [counsel] has to be here."

At the status hearing on Tuesday, July 26, 2016 ("the July 26th hearing"), counsel was present, but it appears that the representative of the Public Defender's Office was not.[6] Counsel stated, "It is my understanding . . . that some things were said that were inaccurate before this Court last week by the Public Defender's Office." In response to that "proffer," counsel contended that his fee arrangement was known to appellant, and that he had sent to appellant's designee a "standard A.B.A. approved fee agreement based upon a retainer which has not fully been paid." He had, however, always been prepared to provide full representation to appellant in the case, and moreover, he was still representing appellant:

---

[6] At the July 22nd hearing, the representative of the Public Defender's Office asked if his attendance would be required for the July 26th hearing, and to the court's response, "I think probably you should be here," replied, "Yes sir." The transcript of the July 26th hearing does not reflect his appearance, and contains only statements by defense counsel, the prosecutors, and the court. No one mentioned the representative by name.

6

I have talked to my client this morning about this matter. I have advised him that I am still ready, willing, and able to represent him because the matter's coming up, and he should not be placed in any posture where he would have to represent himself. He has advised to withdraw my application to withdraw from the case, and he would like me to represent him, and I plan on representing him tomorrow morning.

The court responded, "We'll be ready to go tomorrow morning."

The case proceeded to trial on July 27, 2016 with counsel representing appellant.

We shall include additional details in our discussion.

## DISCUSSION

## I.

### *Maryland Rule 4-215(e)*

Appellant contends that the trial court erred under Maryland Rule 4-215(e) by not addressing appellant's written request to discharge counsel. The State responds that because appellant, through counsel, expressly withdrew his request to discharge counsel, a Rule 4-215(e) inquiry was not required. In appellant's view, however, the ambiguity created by the dueling statements offered by counsel and the representative of the Public Defender's Office, both of whom are officers of the court, required an inquiry of the appellant himself.

The Sixth Amendment right to assistance of counsel carries with it the defendant's freedom to release or discharge counsel because "[a]n unwanted counsel 'represents' the defendant only through a tenuous and unacceptable legal fiction." *Snead v. State*, 286 Md. 122, 128 (1979). Maryland Rule 4-215(e) governs the procedure when a defendant expresses a desire to discharge his or her counsel:

7

> *If a defendant requests permission to discharge an attorney whose appearance has been entered, the court shall permit the defendant to explain the reasons for the request.* If the court finds that there is a meritorious reason for the defendant's request, the court shall permit the discharge of counsel; continue the action if necessary; and advise the defendant that if new counsel does not enter an appearance by the next scheduled trial date, the action will proceed to trial with the defendant unrepresented by counsel. If the court finds no meritorious reason for the defendant's request, the court may not permit the discharge of counsel without first informing the defendant that the trial will proceed as scheduled with the defendant unrepresented by counsel if the defendant discharges counsel and does not have new counsel. If the court permits the defendant to discharge counsel, it shall comply with subsections (a)(1)-(4) of this Rule if the docket or file does not reflect prior compliance.

(Emphasis added).

The Rule "provides an orderly procedure to insure that each criminal defendant appearing before the court be represented by counsel, or, if he is not, that he be advised of the Sixth Amendment constitutional right to the assistance of counsel, as well as his correlative constitutional right to self-representation." *Broadwater v. State*, 401 Md. 175, 180-81 (2007) (internal citation omitted). "[S]trict compliance" is mandated, and "a trial court's departure from [the rule] constitutes reversible error." *Pinkney v. State*, 427 Md. 77, 87-88 (2012).

Rule 4-215(e) is invoked by "[a]ny statement that would reasonably apprise a court of defendant's wish to discharge counsel . . . regardless of whether it came from the defendant or from defense counsel." *State v. Davis*, 415 Md. 22, 32 (2010); *see also State v. Weddington*, No. 52, Sept. Term 2017, 2018 WL 991687, at *5 (Md. Feb. 21, 2018) ("This Court has espoused a broad interpretation of what constitutes a request to discharge counsel."). It "need not be made in writing or even formally worded." *Davis*,

8

415 Md. at 31 (holding inquiry triggered where counsel proffered to the court that defendant in prior conversation indicated that he "[w]anted a jury trial and new counsel"). And, even a statement using the past tense or expressed in a prior-written letter indicating an intent to discharge counsel may be enough to require an inquiry. *See id.*; *Williams v. State*, 435 Md. 474, 491 (2013) (holding that defendant's letter to trial court, written in the present tense, was sufficient to trigger inquiry). But, a Rule 4-215(e) inquiry is not mandated unless counsel or defendant indicates that the defendant has the "*present intent to seek a different legal advisor.*" *Davis*, 415 Md. at 33 (emphasis added).

The State does not dispute that appellant's hand-written letter attached to the motion to withdraw counsel's appearance expressed a then-present desire to discharge counsel. Like the defendant's letter in *Williams*, appellant's letter "clearly, solely, and unequivocally" stated a desire to discharge counsel.[7] 435 Md. at 488-89. Rule 4-215(e) was triggered, as the trial court correctly recognized at the July 22nd hearing: "[T]here's a procedure . . . under the rules as to what the Court's supposed to do . . . and it requires . . . the Court to make certain inquiries . . . . I don't believe that we are in a situation to answer this question today, in the absence of [counsel] and the absence of Mr. Holt." In short, the matter remained pending at the close of the July 22nd hearing.

On July 26th, counsel, in addition to rebutting the earlier assertions, stated to the court, "I have talked to my client this morning about this matter . . . . He has advised to withdraw my application to withdraw from the case, and he would like me to represent

_____

[7] Whether appellant was actually dissatisfied with counsel's services is less clear. For example, he wrote ". . . I am going to have to discharge you. Thank you for all you have done."

him, and I plan on representing him tomorrow."  Counsel's July 26th statement to the court indicated that appellant no longer desired or intended to discharge him.

This case is, in our view, more like *Davis* and *Garner v. State*, 414 Md. 372 (2010), than *Williams* because, between the July 22nd and the July 26th hearings, the court was advised by counsel that appellant had changed his mind.  In *Williams*, the defendant's letter was the last word regarding the discharge of counsel prior to trial.  The Court of Appeals reasoned that it would be "illogical to hold that a court may allow a defendant's expression of a present intent to discharge counsel (sufficient to trigger Rule 4-215(e)) to moulder into a past desire (not sufficient to trigger the Rule) by neglecting, overlooking, or otherwise failing to address promptly the defendant's clear request."  435 Md. at 491.  The *Williams* Court noted that "even if we were to accept the argument that William's aged request reflected a past desire," the trial court must "determine, at some point prior to trial, whether Williams continued to harbor an intent to discharge counsel." *Id.*  The unaddressed intent to discharge counsel in *Williams* "aged," but it did not die; here, it did.

In *Garner*, on the day of the trial, Garner's private counsel informed the court that his client "doesn't think that I have his best interests at heart with regard to this case." 414 Md. at 377.  Garner, who was present, told the court that counsel was "trying to . . . make me take a plea that I don't want to take." *Id.*  The court responded, "I'm not going to make you take a plea," but also "I'm not going to postpone this case." *Id.*  After a

colloquy between the judge and him,[8] Garner stated that counsel could "sit there." *Id.* at 377-78. And, shortly afterwards, when the jury panel had entered the courtroom, counsel addressed the court, "I'm still in the case and on Mr. Garner's behalf, I want to make a motion." *Id.* This Court noted that counsel "professionally and ably conducted the complete defense of th[e] case from start to finish." *Id.* at 380.

In *Davis*, defense counsel, on the morning of the trial, advised the administrative judge that Davis wanted new counsel and a jury trial. 415 Md. at 25. The administrative judge addressed the jury trial request but not Davis's desire for new counsel. *Id.* at 26-28. The Court of Appeals held that counsel's statement regarding his client's desire for

[8] The colloquy is provided below:

[COURT]: [D]o you want to discharge him, is that it?
[DEFENDANT]: Yes, sir.
[COURT]: All right. Would you like me to have him stay to . . . sit next to you at the trial table to be on call if you need his help during the trial? What I'm saying is we are going to have a trial today.
[DEFENDANT]: Is there any kind of way I can discharge him from representing me?
[COURT]: I said . . . you have an absolute right to represent yourself, if you want to. You have an absolute right to get an attorney. You can't wait until the day of trial and come in and tell me that you are going to fire your attorney.

\* \* \*

[DEFENDANT]: I didn't know who to go to to let anybody know, know what I mean, what kind of situation it was. My best interests was to come to the judge that's hearing the case and let him know that I don't-
[COURT]: I don't have anything to do, you chose the attorney. If you had problems, you had to work it out with him. Mr. Anderson is a member of the bar, I'm sure if you told him what your feelings were, I'm sure he would have done something about it.
[DEFENDANT]: I have told him.
[COURT]: What?
[DEFENDANT]: He can sit there.
[COURT]: Okay. Thank you. Go ahead.

11

new counsel was sufficient to trigger a Rule 4-215(e) inquiry, noting that the "defense attorney never told the court that Davis had changed his mind." *Id.* at 29, 35.

But here, as in *Garner*, the "last word" to the trial court indicated that any desire of appellant to discharge counsel had passed. As the *Garner* Court explained:

> Members of the Maryland Bar are officers of the court who have an obligation to comply with the Rules of Professional Conduct. While serving as Petitioner's trial counsel, Rule 1.2 required that [counsel] abide by Petitioner's decision concerning the services to be performed on Petitioner's behalf, and Rule 3.3 prohibited [counsel] from making a false statement to the Circuit Court. When [counsel] stated, "I'm still in the case[,]" the Circuit Court was entitled to rely upon that statement and was not required to make further inquiry.

414 Md. at 390 (emphasis removed).

Appellant argues that the court should not have deferred to counsel as an "officer of the court" because another "officer of the court," who indicated he had had contact with appellant, had proffered an account that alleged serious ethical violations that would discredit counsel's later statements. In appellant's view, the "dueling proffers" created an ambiguity that required the court to make an inquiry of the defendant on *whether* he still wanted to discharge counsel. We are not persuaded that further inquiry into the attorney-client relationship by the court was required.

Simply put, counsel was "still in the case." His statement that appellant wanted to withdraw the motion to discharge him as counsel and wanted him to represent appellant provided that which was missing in *Davis*. *See* 415 Md. at 35.

12

## II.

### *Imperfect Self-Defense*

Defense counsel requested the trial court to instruct the jury on "voluntary manslaughter, imperfect self-defense" with respect to the attempted murder charges.[9] The trial court refused to give the instruction, stating that "there is no evidence in the record with regard to what [appellant] honestly but unreasonably believed with regard to the threat that was posed."

While perfect self-defense, if credited by the trier of fact, results in an acquittal, imperfect self-defense merely negates the element of malice required for conviction of murder and reduces the offense to manslaughter. *State v. Marr*, 362 Md. 467, 473-74 (2001). Counsel contended that, even if firing a gun constituted excessive force, there was evidence generated justifying self-defense by the Holt group against members of the Thornton group who were coming at them with weapons.

A trial court "must give a requested jury instruction where '(1) the instruction is a correct statement of law; (2) the instruction is applicable to the facts of the case; and (3) the content of the instruction was not fairly covered elsewhere in instructions actually given.'" *Cost v. State*, 417 Md. 360, 368-69 (2010) (quoting *Dickey v. State*, 404 Md. 187, 197-98 (2008)); *see generally* Md. Rule 4-325. "[A] defendant is entitled to have

---

[9] In their Briefs, appellant and the State disagree on what specific jury instruction was requested. Appellant cites to Maryland Criminal Pattern Jury Instruction ("MPJI-Cr") 4:17.14 (2d ed., 2016 supp.) (HOMICIDE—ATTEMPTED FIRST DEGREE MURDER, ATTEMPTED SECOND DEGREE MURDER, AND ATTEMPTED VOLUNTARY MANSLAUGHTER (IMPERFECT SELF-DEFENSE)). The State presumes that the requested instruction referred to MPJI-Cr 4:17.2(C) (VOLUNTARY MANSLAUGHTER (PERFECT/IMPERFECT SELF-DEFENSE)).

the jury instructed on any theory of defense that is fairly supported by the evidence, even if several theories offered are inconsistent." *Sims v. State*, 319 Md. 540, 550 (1990).

To be entitled to a jury instruction on imperfect self-defense, the defendant bears the "burden of initially producing 'some evidence' . . . sufficient to give rise to a jury issue with respect to [imperfect self-defense]." *Dishman v. State*, 352 Md. 279, 292-93 (1998) (internal citation omitted). More specifically, the burden is to produce "'some evidence' to support *each element* of the defense's legal theory before the requested instruction is warranted." *Marquardt v. State*, 164 Md. App. 95, 131 (2005) (emphasis added) (citations omitted); *accord McMillan v. State*, 428 Md. 333, 355 (2012). In *Dykes v. State*, the Court of Appeals, discussing an instruction on imperfect self-defense, explained:

> Some evidence is not strictured by the test of a specific standard. It calls for no more than what it says- "some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden. Then the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense.

319 Md. 206, 216-17 (1990).

Whether the requested instruction is applicable to the facts of the case is a "'question of law for the judge.'" *Bazzle v. State*, 426 Md. 541, 550 (2012) (quoting *Dishman v. State*, 352 Md. 279, 292-93 (1998)). On review, we must "determine whether the criminal defendant produced that minimum threshold of evidence necessary to

14

establish a prima facie case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired." *Dishman*, 352 Md. at 292.

This Court adopted the concept of "imperfect" self-defense in *Faulkner v. State*, 54 Md. App. 113 (1983), *aff'd*, 301 Md. 482 (1984), and imperfect self-defense shares common elements with perfect self-defense. To establish perfect self-defense:

> (1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;
> (2) The accused must have in fact believed himself in this danger;
> (3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and
> (4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*State v. Faulkner*, 301 Md. 482, 485-86 (1984); *Dykes*, 319 Md. at 211. But, as the *Faulkner* Court explained:

> Perfect self-defense requires not only that the killer subjectively believed that his actions were necessary for his safety but, objectively, that a reasonable man would so consider them. Imperfect self-defense, however, requires no more than a *subjective honest belief* on the part of the killer that his actions were necessary for his safety, *even though, on an objective appraisal by a reasonable man, they would not be found to be so.*

54 Md. App. at 115 (emphasis added).

Appellant argues that the jury instruction was generated from the facts of the engagement between the two groups on the evening of March 30, 2016 and the encounter earlier that day between appellant and Malachi Thornton. The State contends that appellant failed to produce "some evidence" with respect to two elements of imperfect self-defense: (1) that appellant subjectively believed he was in danger of harm; and (2) that appellant was a non-aggressor. We agree with the State.

15

To invoke either perfect or imperfect self-defense, "some evidence" must be generated from "whatever source" to indicate the defendant's subjective belief that he was in imminent danger of death or serious bodily harm. *State v. Martin*, 329 Md. 351, 361-63 (1993). Direct testimony is not necessary; the necessary belief can be shown circumstantially by "a consideration of his acts, conduct and words." *Id.* (quoting *Taylor v. State*, 238 Md. 424, 433 (1965)).

In *Martin*, the Court of Appeals upheld the trial court's refusal to instruct the jury on imperfect self-defense, concluding that, where the defendant had been so intoxicated that he did not remember any of the events immediately prior to or after the homicide, "some evidence" was not generated. 329 Md. at 353, 368. There, Martin and the victim had two encounters during the day. On the first encounter, the victim told Martin to "get out of there and don't come back" and threatened to "kick[] [his] ass." *Id.* at 361. With regard to the second encounter, the Court wrote:

> [N]either direct nor circumstantial evidence of [Martin's] state of mind at the time of the second encounter was presented. Because no one witnessed the encounter itself, the testimony related to what happened immediately prior to the occurrence-[the victim] saw [Martin] in his parked car and determined to confront him-and immediately afterward-a shot was heard, [the victim] was seen falling, and [Martin] was seen leaving the scene. The testimony did not describe the manner in which [the victim] approached [Martin's] car or the manner in which he carried the party ball and beer cup. No evidence was presented as to whether, and if so, how, [Martin] reacted to [the victim's] approach or what the parties said to each other prior, most particularly, just prior, to the shooting. . . . [B]ecause it provided no details of, or insight into, the circumstances of the shooting from [Martin's] perspective, his acts, his words, his conduct, there was nothing from which to draw an inference as to what [Martin] subjectively believed or felt when he fired the fatal shot.

16

*Id.* at 364. Martin argued that the evidence that he was fearful of the victim as the result of the first encounter provided "some evidence" of his subjective mental belief at the time of the fatal second encounter. *Id.* The Court disagreed, stating that to "justify submitting the issue to the jury, evidence sufficient to support the inference that the relevant state of mind was still in existence at the later time must still be presented." *Id.* at 365.

As noted, the necessary evidence need not come from the defendant or from trial testimony. In *Roach v. State*, 358 Md. 418, 432 (2000), the Court of Appeals held that, based on the evidence, a reasonable jury could have found that the defendant Roach "had a subjective actual belief that his life was in danger and that he had to react with the force that he did, even though . . . these beliefs were unreasonable." That evidence came from a written statement Roach had given to police, which was introduced into evidence at trial, concerning an altercation initially between him and the victim's friend, in which the victim's friend "tried to hit [Roach] and they began to fight." *Id.* at 422-23. In the police statement, Roach said that the victim "came straight to me and start[ed] beating [me] to the ground so I seen [sic] the gun on the ground and [the victim] seen the gun so I thought that he was going to kill me right there on the scene." *Id.* at 422-23.

Here, there were witnesses to the encounter during which the shots were fired, but there is no evidence on the record from any source that appellant subjectively believed he was in imminent danger of death or serious bodily harm when shots were fired at the Thornton group. Viewed in the light most favorable to appellant, the Thornton group, armed with at least a knife and a baseball bat, hopped a fence and ran towards the appellant's group. No words were exchanged, and almost immediately, the shooting

17

occurred. There was no evidence offered that would provide insight into appellant's subjective state of mind during the engagement, or from which his state of mind might be determined circumstantially by "a consideration of his acts, conduct and words." *Martin*, 329 Md. at 363.

Nor is evidence from the earlier encounter between appellant and Malachi Thornton sufficient to generate a jury instruction on imperfect self-defense. During that encounter, Shawn Hamlette produced a gun that he pointed at Cakus, and Malachi asked Hamlette for it. Yet, appellant engaged Malachi in a fight, apparently got the better of him, and voluntarily returned to a new field of battle with the Thornton group that very evening. Had appellant had a subjective actual belief that his life was in danger during the earlier encounter because someone had a gun, there was no evidence to support an inference that "[the earlier] state of mind persisted." *Martin*, 329 Md. at 365.

But even assuming that appellant had a subjective belief that he was in danger, and that was why he brought a weapon to the evening encounter, he was not entitled to the requested instruction. An aggressor cannot claim imperfect self-defense, *Marquardt*, 164 Md. App. at 139 n.22, and, as mutual combatants, appellant and the other participants were all aggressors in the conflict. While "the privilege of self-defense is not necessarily forfeited by arming one's self in anticipation of an attack, [] that right is qualified by the proviso that the right only extends to 'one who [was] not in any sense seeking an encounter.'" *Id.* at 141 (quoting *Perry v. State*, 234 Md. 48, 52 (1964)). After the earlier encounter, appellant and his group learned that the Thorntons were looking for them and wanted to fight. In response, appellant, who was "never . . . a hard person to find,"

18

marshaled his forces and drove to the Homes after dark to engage them. In short, the fight did not come to appellant; appellant went to the fight.

And, although there may be circumstances in which "the heat of passion engendered by the mutual combat" may be legal provocation for the use of deadly force, the gunshots in this case were fired before the battle had begun. *Whitehead v. State*, 9 Md. App. 7, 14 (1970). No blows had been struck, or even words exchanged, to support an inference that the shots were fired in the heat of passion provoked by mutual combat. The trial court did not err in denying the requested jury instruction.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**