571 A.2d 1251

**Jon Carlton DYKES**

v.

**STATE of Maryland.**

No. 119, Sept. Term, 1989.

Court of Appeals of Maryland.

April 11, 1990.

Mark Colvin, Asst. Public Defender (Alan H. Murrell, Public Defender, both on brief), Baltimore, for petitioner.

Sarah E. Page, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and CHASANOW, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired, Specially Assigned).

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

The issue on this appeal relates to the duty of a judge presiding at the trial of a criminal cause to instruct the jury.

The instructions involved touch on the felony of murder, the mitigating doctrine of self-defense (both perfect and imperfect), the evidence adduced, the authority of the judge, and the function of the jury.

### Statement of the Case

Jon Carlton Dykes was found guilty by a jury in the Circuit Court for Somerset County of murder in the second degree. He appealed from the judgment entered on the conviction. The Court of Special Appeals affirmed. *Dykes v. State*, No. 1716, September Term, 1988, filed 7 July 1989, unreported. We granted a petition for certiorari submitted by his attorney, an assistant public defender.[1]

### Murder

Homicide is the killing of a human being by a human being. It is culpable when it is felonious, and it is felonious when it is not justifiable or excusable.

*State v. Ward*, 284 Md. 189, 194, 396 A.2d 1041 (1978). In order for the trier of fact to convict an accused of a crime, the evidence must be legally sufficient to prove the corpus delicti of the crime charged and the criminal agency of the accused. In other words, the evidence must establish, under the reasonable doubt test, that the crime was committed and that the accused committed it. Dykes went to trial on a criminal information which charged that he "did feloniously, wilfully, deliberately and maliciously kill and murder Dwight Lee Landon." Under this charge, the jury could have acquitted Dykes or could have convicted him of

1) murder in the first degree; or

2) murder in the second degree; or

3) manslaughter.

*Id.* at 200–201, 396 A.2d 1041. The jury returned a verdict of guilty of murder in the second degree.

---

1. We denied a petition for a writ of certiorari filed by Dykes pro se and a conditional cross-petition filed by the State.

In the petition we granted, Dykes does not dispute that the manner of Landon's death was homicide and that the cause of death was multiple stab wounds.[2] Nor does he claim that the evidence was not sufficient to warrant a conviction of murder in the second degree. And he does not deny that he was the person who inflicted the wounds resulting in Landon's death. But he contends that the judgment must be reversed because the jury was not made aware, even if it found that he committed the homicide, that he would not be culpable at all if it found he killed Landon in perfect self-defense, and that he would be culpable only for the crime of manslaughter if the jury found that the killing was committed in imperfect self-defense. In the former event, he suggests the verdict would properly be not guilty; in the latter event, the verdict would properly be guilty of manslaughter, not murder. The contention arises from the refusal of the trial judge to grant Dykes's request that the jury be instructed as to perfect self-defense and imperfect self-defense.

## Self–Defense

Dykes's view of the doctrines of perfect self-defense and imperfect self-defense is not adverse to the letter of the law.

## (1)

### Perfect Self–Defense

■ Homicide committed in *perfect self-defense* is either

---

**2.** The Post Mortem Examination Report so stated the manner and cause of Landon's death. It described 207 wounds—149 stab wounds spread over the back, 4 cutting wounds of the buttocks, 4 stab wounds of the face, 6 stab wounds of the left ear, 14 stab wounds of the chest, 20 stab wounds of the left arm, 8 stab wounds of the left flank, and 2 defensive-type wounds of the hands. It declared that the wounds caused extensive bleeding externally and also injured the spinal cord, lungs, and spleen.

justifiable or excusable.[3] When the defense is established, the killer is not culpable. Perfect self-defense

> operates as a complete defense to either murder or manslaughter. A successful [perfect] self-defense, therefore, results in the acquittal of the defendant.

*State v. Faulkner,* 301 Md. 482, 485, 483 A.2d 759 (1984). In *Faulkner,* Judge Cole, writing for the Court, set out the requirements for a person to be found not culpable when acting in perfect self-defense in committing a homicide:

> (1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;
>
> (2) The accused must have in fact believed himself in this danger;
>
> (3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and
>
> (4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*Id.* at 485–486, 483 A.2d 759. *See* cases cited therein at 486, 483 A.2d 759.

### (2)

### *Imperfect Self–Defense*

■ The Court of Special Appeals discussed *imperfect self-defense* in *Faulkner v. State,* 54 Md.App. 113, 114–115, 458 A.2d 81 (1983), *aff'd, State v. Faulkner,* 301 Md. 482, 483 A.2d 759 (1984). The court observed:

> From the turbulent waters of the criminal law of Maryland, roiled by the dictates of *Mullaney v. Wilbur,* 421

---

**3.** In modern times, the distinction between "justifiable" and "excusable" as to a homicide committed in perfect self-defense has no practical effect in application because, under either characterization, the killer is not culpable. *See Faulkner v. State,* 54 Md.App. 113, 115 n. 1, 458 A.2d 81 (1983), *aff'd, State v. Faulkner,* 301 Md. 482, 483 A.2d 759 (1984).

U.S. 684, 95 S.Ct. 1881 [44 L.Ed.2d 508] (1975), emerged an esoteric qualification to the doctrine of self-defense, known as the "imperfect right of self-defense." We noticed it in *Evans v. State*, 28 Md.App. 640, 658, n. 4, 349 A.2d 300 (1975), *aff'd, State v. Evans*, 278 Md. 197, 362 A.2d 629 (1976), recognized it in *Shuck v. State*, 29 Md.App. 33, 40–45, 349 A.2d 378 (1975), *cert. denied*, 278 Md. 733 (1976), mentioned it in *Wentworth v. State*, 29 Md.App. 110, 120–121, 349 A.2d 421 (1975), *cert. denied*, 278 Md. 735 (1976), and applied it in *Law v. State*, 29 Md.App. 457, 463–465, 349 A.2d 295 (1975), *cert. denied*, 278 Md. 726 (1976).

In its *Faulkner*, the intermediate appellate court confirmed its adoption of the doctrine and again applied it, but noted that "[t]he Court of Appeals has not yet addressed the matter." *Id.* at 115, 458 A.2d 81. We "addressed the matter" on our review of the Court of Special Appeals' *Faulkner* by way of certiorari. We first noted that "[i]mperfect self-defense, by contrast [with perfect self-defense], is not a complete defense." 301 Md. at 486, 483 A.2d 759. We explained that "[i]ts chief characteristic is that it operates to negate malice, an element the State must prove to establish murder." *Id.*

> As a result, the successful invocation of this doctrine does not completely exonerate the defendant, but mitigates murder to voluntary manslaughter.

*Id.* We recognized that "[i]mperfect self-defense ... is different from either [perfect] self-defense or the commonly recognized mitigation defenses [such as heat of passion which provokes a homicide]." *Id.* We traced the history and development of the imperfect self-defense doctrine and explored the various views with respect to the standard for applying it. *Id.* at 486–499, 483 A.2d 759. We settled on "the honest but unreasonable belief standard of imperfect self-defense" as "the proper one to be followed in Maryland." *Id.* at 499–500, 483 A.2d 759. We quoted with approval, *id.* at 500, 483 A.2d 759, the Court of Special Appeals' *Faulkner*, 54 Md.App. at 115, 458 A.2d 81, as

articulating the ingredients of the defense under that standard as distinguished from perfect self-defense:

"Perfect self-defense requires not only that the killer subjectively believed that his actions were necessary for his safety but, objectively, that a reasonable man would so consider them. Imperfect self-defense, however, requires no more than a subjective honest belief on the part of the killer that his actions were necessary for his safety, even though, on an objective appraisal by a reasonable man, they would not be found to be so. If established, the killer remains culpable and his actions are excused only to the extent that mitigation is invoked."

We agreed that

this statement represents an analytically sound view, and reflects the position taken by a majority of those jurisdictions that have addressed and embraced this defense.

*Faulkner*, 301 Md. at 500, 483 A.2d 759. We explained:

Logically, a defendant who commits a homicide while honestly, though unreasonably, believing that he is threatened with death or serious bodily harm, does not act with malice. Absent malice he cannot be convicted of murder. Nevertheless, because the killing was committed without justification or excuse, the defendant is not entitled to full exoneration. Therefore, as we see it, when evidence is presented showing the defendant's subjective belief that the use of force was necessary to prevent imminent death or serious bodily harm, the defendant is entitled to a proper instruction on imperfect self-defense.

*Id.* (footnote omitted). It follows, we pointed out, that if the jury concluded that the defendant honestly believed that the use of force was necessary but that this subjective belief was unreasonable under the circumstances, then its verdict would be guilty of voluntary manslaughter.

*Id.* at 501, 483 A.2d 759. This is so, we declared, because the conduct of the defendant in these circumstances negates the presence of malice, a prerequisite to a finding

of murder, but the defendant is nevertheless to blame for the homicide and should not be rewarded for his unreasonable conduct.[4]

*Id.* We also agreed with the observation of the Court of Special Appeals, 54 Md.App. at 118 n. 5, 458 A.2d 81:

It is difficult to envision circumstances which are sufficient to generate the issue of justification or excuse by way of perfect self-defense which do not also generate the issue of mitigation by way of imperfect self-defense. Generally, if a defendant is entitled to an instruction with respect to the former, he will be entitled to an instruction with respect to the latter.

301 Md. at 502, 483 A.2d 759. We said:

It is hard to imagine a situation where a defendant would be able to produce sufficient evidence to generate a jury issue as to perfect self-defense but not as to imperfect self-defense. It seems clear to us that if the reasonableness of a defendant's belief is at issue, as it is in self-defense, *a fortiori*, the existence of that belief is also at issue. Therefore, the jury must reject the reasonableness

---

4. We rejected the State's contention that "the subjective nature of imperfect self-defense warrants its rejection because the defense rewards unreasonableness." *State v. Faulkner*, 301 Md. at 503, 483 A.2d 759. We found this contention to be unpersuasive for two reasons. First, criminal law is predicated on the concept that an offender's level of culpability is dependent on his mental state. Strict liability offenses are the exception, not the rule. Second, a mitigation defense such as imperfect self-defense provides little reward for unreasonableness: a conviction of manslaughter rather than murder. Although the difference is substantial, a successful defense based on imperfect self-defense never results in the exculpation of the defendant.

*Id.* We also rejected the State's contention that imperfect self-defense should only be available if the facts indicate "extreme extenuating circumstances." *Id.* at 501, 483 A.2d 759. We pointed out that the phrase "extreme extenuating circumstances" was not clearly defined and that the cases dealing with imperfect self-defense "do not lend themselves to [that] categorization...." *Id.*

of the defendant's belief as well as the existence of that belief to find the defendant guilty of murder.

*Id.* at 502–503, 483 A.2d 759.

It is clear from our *Faulkner* that "when evidence is presented showing the defendant's subjective belief that the use of force was necessary to prevent imminent death or serious bodily harm, the defendant is entitled to a proper instruction on imperfect self-defense." 301 Md. at 500, 483 A.2d 759 (footnote omitted), quoted in *Simmons v. State,* 313 Md. 33, 39, 542 A.2d 1258 (1988). For entitlement to the instruction with respect to both perfect self-defense and imperfect self-defense,

> the defendant has the "burden of initially producing 'some evidence' on the issue of mitigation or self-defense ... sufficient to give rise to a jury issue.... Once the issue has been generated by the evidence, however, the State must carry the ultimate burden of persuasion beyond a reasonable doubt on that issue."

*Simmons,* 313 Md. at 39–40, 542 A.2d 1258, quoting *State v. Evans,* 278 Md. at 207–208. *See Cunningham v. State,* 58 Md.App. 249, 257, 473 A.2d 40, *cert. denied,* 300 Md. 316, 477 A.2d 1195 (1984).

### (3)

#### The "Some Evidence" Requirement

Prior to *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, we believed, and so held, that "the burden is upon [the defendant] to prove by a preponderance of the evidence that he acted in self-defense." *Wilson v. State,* 261 Md. 551, 559, 276 A.2d 214 (1971). We learned from *Mullaney* that we were wrong. The holding in *Mullaney,* decided in the light of *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), reached a jury instruction given in a homicide case. It taught us that an instruction which cast upon the defendant in a homicide case the burden of persuasion by a preponderance of the evidence, when the issue of self-defense was raised by the evidence, was consti-

tutionally defective since it shifted the burden to the defendant to prove justification or excuse for the homicide. *State v. Evans,* 278 Md. at 207, 362 A.2d 629. We discovered through *Mullaney* and *Winship* that

> due process of law is offended by placing the burden on the defendant to prove, *by any standard,* the existence of mitigating circumstances necessary to lower a felonious homicide to the level of manslaughter.

*Id.* at 206, 362 A.2d 629 (emphasis added). Therefore, we declared, "All Maryland homicide cases involving the defense of mitigation which contain contrary holdings are no longer valid precedents." *Id.* We were careful to point out, however, that

> the burden of initially producing "some evidence" on the issue of mitigation or self-defense (or of relying upon evidence produced by the State) sufficient to give rise to a jury issue with respect to those defenses, is properly cast upon the defendant.

*Id.* at 208, 362 A.2d 629. It is only when "some evidence" has been adduced which is looked to by the defendant on the issue of self-defense or other mitigation, that the State "must carry the ultimate burden of persuasion beyond a reasonable doubt on that issue." *Id.*

In *Evans* we were talking in terms of *perfect* self-defense, although not by that nomenclature. We did not characterize self-defense as "perfect" or "imperfect" because we had not then adopted the concept of *imperfect* self-defense. It was after our *Evans* that *imperfect* self-defense surfaced in this Court and was accepted by us as a mitigating defense in the criminal law of Maryland. But our holdings in *Evans* also spoke to mitigating defenses other than perfect self-defense. *Id.* at 208–209, 362 A.2d 629. Imperfect self-defense is another mitigating defense and, thus, is clearly within the ambit of the *Evans* teachings. *Faulkner,* 301 Md. at 486, 483 A.2d 759.

 *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says—

"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden. Then the baton is passed to the State. It must shoulder the burden of proving beyond a reasonable doubt to the satisfaction of the jury that the defendant did not kill in self-defense.

### *The Evidence Adduced*

There were no eyewitnesses to the homicide. It took place in a bedroom of a mobile home trailer in which Landon resided. The trailer was in a trailer park in Princess Anne, Somerset County, Maryland. A Maryland State Trooper described the outside of the trailer and the floor plan. At the suggestion of the prosecutor, he drew, for the edification of the jury, a diagram of the exterior and interior of the trailer, showing the two doors providing ingress and egress to the trailer and the location of five rooms off a hallway which ran the length of the trailer. Landon's body was found in the master bedroom at the rear of the trailer, on the floor beside the bed. The jury was shown a color photograph depicting the body in the position and the condition in which it was found. The photograph also showed a part of the bedroom floor, cluttered ankle deep with discarded clothing, bags, shoes, coat hangers, and other articles between the door to the bedroom and the body. The Post Mortem Examination Report, to which were appended nine photographs of Landon's nude body showing the wounds in close-up, was received in evidence. The Trooper testified as to the events leading to the finding of the body, how the investigation became focused on Dykes, and the circumstances of Dykes's arrest and interrogation.

The details of the commission of the homicide came from Dykes. The interrogation of him by the police was over a period of almost two hours, with a break for dinner. Without prodding, Dykes readily gave a statement which, when transcribed, covered nine and one-half pages. The statement was read verbatim to the jury. Dykes also testified at the trial. The result was that the jury had before it three versions of the events leading to the homicide and of the circumstances of the killing itself, all from the mouth of Dykes. We set out a compendium of each version.

In the first version Dykes averred that Landon, who was not known to him previously, abducted him at gunpoint outside a bar and drove him to Landon's house trailer. By the time they arrived, Dykes believed, from Landon's remarks en route, that Landon was a homosexual. Landon forced him into the trailer, pressing the gun to his neck and telling him they would get "some action." Dykes stalled by asking to use the bathroom. Dykes found a "butter knife" in the bathroom, which he picked up. He did not leave the trailer because he feared Landon would shoot him. Landon was in the master bedroom. He was sitting on the bed, naked from the waist down and masturbating. Landon saw the knife in Dykes's hand and grabbed a steak knife, which was on a table by the bed. Dykes punched Landon in the face; Landon punched him back. Dykes hit him again, and Landon fell. Dykes then stabbed Landon a "couple times" with the butter knife, which broke off inside Landon. Landon was still "moving and trying to get" Dykes; he "kept coming at [him]." Landon stabbed Dykes in the hand. Dykes hit Landon in the face again whereupon Landon's grip on the steak knife relaxed. Dykes took the steak knife and stabbed Landon "a couple times." Dykes left the room. Dykes told the police that he hated "queers" because "it's sick, immoral. I don't think God put us on this earth to do that."

In the second version, offered after the dinner break, Dykes recanted the abduction scenario. Dykes denied that Landon threatened him with a gun. Dykes said that he

went with Landon because Landon offered to give him some cocaine. Dykes did not think that Landon was a homosexual en route to Landon's trailer. When they arrived, Landon went down the hallway of the trailer to get the cocaine. Dykes asked to use the bathroom where he found a knife and put it in his pocket, "just in case I might need it...." He entered the back bedroom where he found Landon masturbating. Landon reached for a knife on a bedside table, and Dykes "rushed him." Dykes was not sure "who got who first." They struggled, each hitting the other. Landon was "clawing" Dykes. He was "coming at [Dykes] and [Dykes] poked him a couple times with the butter knife." Even after the butter knife broke, Landon "still kept coming at [Dykes]." Dykes hit him in the face, and Landon's "hand opened up," so Dykes "grabbed [Landon's] knife" and "got him with [it]...." Landon fell back. Dykes left the room.

The third version, as presented by Dykes in his testimony at trial, was substantially similar to the second version to the point when Dykes left the bathroom and stopped by the master bedroom where he found Landon sitting on the side of the bed masturbating. From there on, Dykes's telling of the events diverged somewhat from the second version and expanded on it in significant part. Dykes claimed that when he stood in the doorway of the bedroom, Landon made a lewd proposition. Dykes rushed the five or six feet across the cluttered floor to the bed to hit Landon with his fist because he was afraid Landon would try to hurt him or have sex with him. He said that he "possibly" could have escaped at that time but that "[i]t was so quick. I did not think about it. I didn't have time." After Dykes hit him, Landon reached behind him, grabbed a steak knife, and cut Dykes on the hand. As Dykes was looking at his bleeding hand, Landon threw him on the bed and got on top of Dykes's chest, pinning one arm to his side. Landon hollered that he was going to kill Dykes and "came down" with both his hands on the knife, "yelling and slamming at

[him]." Dykes wrapped his legs around Landon's neck and pulled him down on the bed. Landon dropped the steak knife. Dykes took the butter knife he found in the bathroom out of his pocket and "stabbed [Landon] a few times on the bed." The butter knife broke. Dykes claimed that all the while Landon was "choking" him, that Landon "threw [him] against the wall and was choking [him] there." Dykes maintained that "[t]he whole time this incident was happening [Landon] was choking and hitting me." When Dykes picked up the steak knife, he "stuck [Landon] a few more times and [Landon] fell down." Dykes maintained that he could not "get away" from Landon after Landon dropped the steak knife because Landon was "hanging on [to Dykes's] throat [with] his hands." Dykes avowed that he was unaware of the rear door in the trailer which led off the hallway near the master bedroom. He further asserted that he lied in his first version about the circumstances under which he went to the trailer because he did not want the police or his mother to know that he used cocaine.

### Authority of the Judge

Maryland Rule 4–325(c) provides, in pertinent part:

The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding.... The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

See Smith v. State, 302 Md. 175, 179, 486 A.2d 196 (1985), quoting with approval Bruce v. State, 218 Md. 87, 97, 145 A.2d 428 (1958) ("it is incumbent upon the court, ... when requested in a criminal case, to give an ... instruction on every essential question or point of law supported by evidence"); Blackwell v. State, 278 Md. 466, 477, 365 A.2d 545 (1976), cert. denied, 431 U.S. 918, 97 S.Ct. 2183, 53 L.Ed.2d 229 (1977) (where there is no evidence supporting an instruction, it need not be given).

It is clear from the record that requests were made to instruct the jury on the doctrine of self-defense, both perfect and imperfect.[5] And defense counsel made timely objection to the refusal of the judge to grant his requests. Md.Rule 4–325(e).

■ The threshold determination whether the evidence was sufficient to generate the doctrine of self-defense was a question of law for the judge. We believe that the judge erred as a matter of law in refusing to grant Dykes's requests for the instructions. He recognized that the burden was on Dykes to generate the issue of perfect and imperfect self-defense. But we think that he mistook the nature of that burden. He did not find that the law of self-defense was inapplicable because the evidence, even when viewed in the light most favorable to Dykes, did not mount up to "some" evidence, which would tend to show that the homicide was within the ambit of self-defense. Rather, he justified his refusal on findings of fact. He recounted the evidence in detail and found:

1) The evidence was not sufficient to show that Landon was the aggressor.

2) Dykes had the opportunity to retreat and did not do so.

3) Dykes raised a fist fight to a deadly level; he took the fight beyond a mere skirmish between two individuals to the deadly weapon stage.

---

**5.** We glean from the argument on the matter, out of the presence of the jury, that defense counsel had submitted an instruction on perfect self-defense and imperfect self-defense and that the prosecutor had presented an instruction on imperfect self-defense, all requests apparently in writing. *See* Md.Rule 4–325(b). The written requests are not included in the record before us, and we do not know how they were phrased. In any event, there is no indication that they were denied because they did not correctly state the law and clearly they were not fairly covered by instructions actually given. After the judge had charged the jury, the only requested instructions preserved were those of Dykes seeking instructions on perfect and imperfect self-defense. The prosecutor said that he was not going to argue his request for an instruction of imperfect self-defense, and he did not argue it.

4) Dykes was in no danger at all of serious bodily harm after Landon had dropped his knife.

The judge concluded:

I don't think the question of self-defense or an imperfect self-defense has been generated by the evidence. About all the evidence has got to say about that is [Dykes] was lured to [Landon's] home and he was lied to. He went willingly to engage in an illegal activity, and he found out after he got there he had been lied to and he wasn't going to be able to engage in that illegal activity.

Certainly that is not sufficient provocation to kill a man, to stab a man. He had a chance to leave, and he didn't. Instead of leaving he did the opposite. He advanced towards the man. He had armed himself before he did it.

So I don't believe that the question of self-defense or partial self-defense has been generated by the evidence, and I am not going to give an instruction on it.

In short, the judge resolved conflicts in the evidence, choosing which parts of Dykes's statement and testimony to believe, weighed the evidence and made findings of fact. On this culling of the evidence, he found that the elements necessary to establish perfect self-defense had not been established and that the incidents of imperfect self-defense had not been met. This went far beyond his authority.

It is now firmly established, as we have seen, that there is a legal basis in the administration of criminal justice in this State for an instruction on imperfect self-defense as well as on perfect self-defense. And we think that Dykes met the burden we have imposed on a defendant to establish a factual basis for the instructions. When the evidence before the jury here is winnowed so as to leave that which is most favorable to Dykes, it takes no more than a casual scanning to disclose that it is not bereft of "some" evidence which, if believed by the jury, would be sufficient for it to find that the elements of perfect self-defense or the incidents of imperfect self-defense were fulfilled. For example, there was "some" evidence, even

though it may be difficult to accept, which was sufficient to create a jury issue whether, in fact:

 1) Landon was the initial aggressor;

 2) Dykes was in imminent fear of being sexually assaulted;

 3) if Landon was not the initial aggressor, he became the aggressor by escalating a non-deadly affray to a deadly level;

 4) a safe retreat was not reasonably possible;

 5) the force used by Dykes was not excessive in the circumstances, especially in light of evidence tending to show that Landon was persistently choking Dykes;

 6) Dykes had a subjectively honest and objectively reasonable belief that he was in imminent danger of death or serious bodily injury.

If the jury so found, it could have concluded, guided by proper instruction and looking to the totality of the circumstances, that the doctrine of perfect self-defense applied. If the jury found the first five of those factors but determined that Dykes had a subjectively honest but objectively unreasonable belief that he was in imminent danger of death or serious bodily injury, it could have concluded that the doctrine of imperfect self-defense applied. *See Perry v. State,* 234 Md. 48, 52, 197 A.2d 833 (1964); *Crawford v. State,* 231 Md. 354, 361, 190 A.2d 538 (1963); *Bennett v. State,* 230 Md. 562, 567, 188 A.2d 142 (1963); *Gunther v. State,* 228 Md. 404, 409, 179 A.2d 880 (1962) (all to the effect that a person not seeking a fight but fearing an attack may arm himself in anticipation of the attack); *Watkins v. State,* 79 Md.App. 136, 139, 555 A.2d 1087 (1989) (defendant may claim self-defense, even as initial aggressor, if victim escalated altercation to deadly level); *Lambert v. State,* 70 Md.App. 83, 93, 519 A.2d 1340, *cert. denied,* 309 Md. 605, 525 A.2d 1075 (1987) (while general self-defense rule precludes use of deadly weapon against unarmed assailant, account must be taken, among other things, of respective size of defendant and assailant and violent na-

ture of unarmed attack);[6] *Tipton v. State,* 1 Md.App. 556, 562, 232 A.2d 289 (1967) (where defender uses deadly force against nondeadly attacker, original attacker becomes defender).

■ Of course, what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury, not the judge, to determine. *Gore v. State,* 309 Md. 203, 210, 214, 522 A.2d 1338 (1987); *Wilson v. State,* 261 Md. 551, 566, 276 A.2d 214 (1971); *Jacobs v. State,* 238 Md. 648, 650, 210 A.2d 722 (1965).[7] When the trial judge resolves conflicts in the evidence, in the face of the "some" evidence requirement, and refuses to instruct because he believes that the evidence supporting the request is incredible or too weak or overwhelmed by other evidence, he improperly assumes the jury's role as fact-finder.

### The Function of the Jury

■ The instructions which the judge gave informed the jury that it was bound by the law as explained by him. He said:

> Even if you don't agree with it, you must accept that law and apply it to the facts as you find them to be. You are not a legislative body. You have no authority to change the Maryland criminal law. So you will take the law as I explain it to you and then you will apply it to the facts as you find them to be from the evidence.

---

**6.** Dykes was 21 years old, 6' tall, and weighed 145 pounds. Landon was 33, 5'7½" tall, and weighed 198 pounds.

**7.** It was of no matter what the judge believed and how he would have decided the case. At the disposition stage of the trial, he informed Dykes:

> Had you been tried without a jury, you may have been found guilty of first degree murder. Had you been tried by me without a jury, no way could it have been less than second degree but may very well have been first degree. Your decision to go with a jury was probably a good decision.

And he told the jury that it was "the sole judge of facts in a criminal case...." But he did not give the jury the law of self-defense. Contrary to his duty, the judge denied to the jury the opportunity to apply the law of perfect self-defense and imperfect self-defense to its findings of fact, according to tenets of that law as explained by the judge as an authoritative figure. We have concluded that the evidence here was sufficient, if believed by the jury, to engender the doctrine of self-defense. Then the burden should shift to the State to prove beyond a reasonable doubt that Dykes did not kill in self-defense. The judge precluded the shifting of the burden. The failure to give the instructions in the circumstances was reversible error; it stymied the function of the jury to determine the issue of self-defense and deprived Dykes of his entitlement to have the jury so determine. *Wilson*, 261 Md. at 566, 276 A.2d 214. We reverse the judgment of the Court of Special Appeals and award Dykes a new trial.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED;

CASE REMANDED TO THAT COURT WITH DIRECTION TO REMAND THE CASE TO THE CIRCUIT COURT FOR SOMERSET COUNTY FOR A NEW TRIAL;

COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY SOMERSET COUNTY.