*Isiah A. Hollins v. State of Maryland*, No. 5, September Term, 2024, Opinion by Killough, J.

**JURY INSTRUCTIONS—SUFFICIENCY OF EVIDENCE.** In a criminal jury trial in which the defendant was charged with attempted first-degree murder and related assault charges and was asserting self-defense, the defense requested a non-pattern jury instruction that the victim had a character trait for violence and that the jury could, therefore, infer that the victim was the initial aggressor. The trial court refused to give the requested jury instruction on the basis that it was not a pattern jury instruction. The Supreme Court of Maryland held that the trial court abused its discretion in refusing to consider the requested jury instruction on that basis. Undertaking a de novo review of the evidence, the Supreme Court of Maryland held that there was "some evidence" generated that the victim had a character trait for violence and that the jury could, therefore, reasonably infer that he was the initial aggressor.

**JURY INSTRUCTIONS BASED ON INFERENCES—CIRCUIT COURT'S DISCRETION.** Although a trial judge is required to give instructions on the applicable law, the judge is not required to give an inferential instruction even if the evidence generates the requested instruction. Instead, the trial judge must consider whether to give the instruction in the exercise of the judge's discretion. Here, the trial court abused its discretion by failing to exercise such discretion.

Circuit Court for Montgomery County
Case No.: C-15-CR-22-000206
Argued: September 9, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 5

September Term, 2024

_____

ISIAH A. HOLLINS

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Opinion by Killough, J.

_____

Filed: December 23, 2024

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

This appeal arises out of the second-degree assault conviction of Petitioner Isiah Hollins in the Circuit Court for Montgomery County. The criminal charges against Hollins resulted from an altercation between Hollins and Alexander Alvarenga. Hollins and Alvarenga were both working at a McDonald's restaurant in Rockville on the evening of November 16, 2021. During the fight, Hollins, using a small, concealable knife, stabbed Alvarenga six or seven times in the head. Hollins was charged with attempted first-degree murder and related assault charges.

At trial, Hollins argued self-defense. He wanted to show that Alvarenga had a propensity for violence, and therefore, was the initial aggressor. Accordingly, Hollins sought to cross-examine Alvarenga about the physical injuries that Alvarenga had sustained in an unrelated incident that occurred a day or so before trial. The trial court did not permit Hollins to pursue this line of questioning. At the conclusion of the trial, the court denied Hollins's request to provide a non-pattern jury instruction regarding Alvarenga's propensity for violence.

The jury acquitted Hollins of attempted first-degree murder and first-degree assault but convicted him of second-degree assault. The court sentenced Hollins to ten years' imprisonment, with two years suspended, and five years of probation upon release. Hollins filed a timely appeal to the Appellate Court of Maryland. A divided panel of the Appellate Court affirmed Hollins's conviction in an unreported decision. *Hollins v. State*, No. 2023, Sept. Term, 2022, 2023 WL 8641392 (Md. App. Ct. Dec. 14, 2023). Hollins filed a petition for writ of *certiorari*. We granted the petition, *Hollins v. State*, 487 Md. 32 (2024), to consider the following questions:

1. Did the intermediate appellate court erroneously apply a sufficiency of the evidence standard instead of the "some evidence" standard when it upheld the denial of Petitioner's request for a non-pattern jury instruction regarding the alleged victim's propensity for violence? [1]

2. Did the trial court violate the Confrontation Clause of the U.S. Constitution when it prohibited Petitioner from cross-examining the alleged victim about visible injuries to rebut the claim raised on direct examination that the victim had outgrown any violence in his past?

For the reasons discussed below, we hold that Hollins generated "some evidence" sufficient to permit a jury to find that Alvarenga had a propensity for violence and, therefore, infer that he was the initial aggressor. The circuit court abused its discretion when it refused to give the requested jury instruction on the basis that it was not a pattern jury instruction. Given that there was sufficient evidence presented to generate the instruction, the circuit court was required to exercise its discretion and consider whether to give it. Because it is clear from the record that the circuit court did not exercise its discretion, we reverse the judgment of the Appellate Court of Maryland and remand this case to the circuit court for a new trial. [2]

---

[1] In his briefing and in oral argument, Petitioner did not argue that the Appellate Court applied the wrong standard—only that it applied the standard incorrectly. As we explain in more detail herein, we agree that the Appellate Court incorrectly applied the standard on appeal. That said, our primary focus is on whether the circuit court erred in refusing to give the requested instruction. We have rephrased the Petitioner's question accordingly.

[2] Because we grant Hollins a new trial based on our resolution of his first question, we will not reach his second question.

# I

## Factual and Procedural Background

### A. The Night of the Fight

Hollins was Alvarenga's supervisor at a McDonald's restaurant in Rockville. During the evening shift on November 16, 2021, a fight broke out between them in the parking lot outside the restaurant. The fight ended with Hollins stabbing Alvarenga in the head several times with a knife. Hollins and Alvarenga dispute who instigated the fight, and no witnesses saw how it started.

#### 1. Alvarenga's Testimony

The State called Alvarenga in its case-in-chief. Alvarenga testified that on the day in question, he was working the evening shift. At some point around 10:15 p.m., Hollins, who was the supervisor on duty, ridiculed Alvarenga's Spanish pronunciation in front of a female co-worker, Gloria Saravia. Alvarenga admitted at trial that this angered him.

Alvarenga testified that after his shift replacement, Maurice Ware, arrived at work at approximately 11:00 p.m., Alvarenga went to tell Hollins that he was going home. Alvarenga left the McDonald's restaurant through the door on the opposite side from where his car was parked because he was looking for Hollins in order "to defend himself." Once outside, Alvarenga testified that Hollins emerged from behind a bush swinging a ten-to-twelve-inch chef's knife and threatening to kill him. Hollins stabbed Alvarenga six or seven times, resulting in cuts to Alvarenga's lip, arm, hand, and scalp. According to Alvarenga, Hollins repeatedly threatened to kill him as he was using the knife. The two men ended up on the ground as they struggled over the knife. Alvarenga recalled that as

3

the two fought on the ground, a man yelled for them to stop. Hollins then ran toward his vehicle. Alvarenga said that Hollins yelled out his window, "I told you all I'm a killer," before driving off.

Presumably, because Hollins claimed self-defense and intended to portray Alvarenga as the initial aggressor, the State preemptively sought to present to the jury potentially damaging testimony about Alvarenga before the defense could do so. The State asked Alvarenga (1) about several fights that occurred prior to his encounter with Hollins and (2) about two prior convictions that he had for assault: one for slapping the hood of a police vehicle and the other for spitting on a police officer's leg. In response, Alvarenga testified, "[o]ne time, when I was younger, I, what's it called, I hit a cop car." He explained, "[l]ike, I smacked the car, like, with my hand." Alvarenga also recalled a "spitting incident." He said, "[a]nother time when I was younger, I was just—I spit on a police officer, but on, like, on his leg." Also, Alvarenga testified that "when [he] was younger," he "used a credit card that wasn't [his]." Alvarenga was twenty-two years old on the date of the incident with Hollins, and his most recent assault conviction occurred when he was approximately twenty years old.

On cross-examination, Alvarenga conceded that he told the police in a recorded statement that he intended to fight Hollins "like, one-on-one, you know, like men do." He further testified that he agreed to go outside to fight Hollins, who had suggested waiting for Alvarenga's shift replacement, Ware. Alvarenga testified that, during the confrontation with Hollins, the two started pushing and shoving each other and that Hollins said, "you punched me," to which Alvarenga responded, "no, you punched me first." Alvarenga

4

admitted to the police that he had been in three to four fights in addition to his two prior assaults on police officers in 2018 and 2019 and that he told Hollins that he trained as a boxer.

*2. Hollins's Testimony and Related Evidence*

Hollins testified that he arrived at work around 9:20 p.m. for his overnight shift. He immediately started working the drive-through window. At 10:14 p.m., Hollins left the restaurant to move his vehicle to the side of the building so that he could consume drugs without anyone seeing him. After consuming drugs, Hollins returned to the restaurant, where he overheard Alvarenga and Saravia speaking Spanish. When Hollins asked Alvarenga about his dialect, Alvarenga approached him and told him to "shut up." Saravia intervened by repeatedly telling Alvarenga, "tranquilo," which Hollins understood to mean "calm down."

After the interaction, everyone returned to their workstations. Hollins testified that, soon after, Alvarenga approached him and asked him if he wanted to "step outside." According to Hollins, Alvarenga also threatened to "put a knife" in him, but he testified that he did not think that Alvarenga was being "serious." In response, Hollins told Alvarenga to talk to him once Ware arrived. When Ware arrived, Alvarenga told Hollins to step outside. Hollins left through the front side door and went to his car to retrieve pre-rolled marijuana cigarettes, which he took to the patio to "smoke and have a conversation." Alvarenga came out shortly thereafter.

Hollins testified that he approached Alvarenga and told him that he would tell the general manager that Alvarenga had threatened him. According to Hollins, Alvarenga

punched him in the left side of his face and continued to throw punches. Hollins started pushing Alvarenga back. Hollins then moved forward and lost his balance on a small step near the door, holding onto Alvarenga as they both fell to the ground. As both men returned to their feet, Hollins took out his retractable knife with a brass knuckle handle and swung the knife once before using it to punch Alvarenga, who continued to throw punches as well. Hollins testified that he held down one of Alvarenga's arms as he punched him with the brass knuckle handle of the knife. They continued to struggle until Alvarenga complained about blood in his eyes. Hollins then asked Alvarenga to let go of him, and Alvarenga complied. Hollins walked to his vehicle, and Alvarenga walked away through a planted area.

Hollins testified that he left the restaurant in his vehicle and yelled out his window that Alvarenga was going to get fired. He also testified about the injuries he sustained in the fight, including a sprained wrist, bite marks, nosebleed, headaches, and blurry vision, which led him to seek medical treatment.

Defense counsel called two witnesses who saw the altercation (although not how it began). The first witness was George Russo, a bystander who happened to be in his car at the time of the fight. Russo testified that he saw two men come out of the McDonald's "fussing," "yelling and screaming" at each other. Russo then heard the men yelling "you pushed me, no you pushed me first." When Russo walked toward the commotion, he saw Hollins on top of Alvarenga. The second witness, Ware, testified that Alvarenga was unfriendly to everyone that night and, at some point, asked Hollins if he was "ready to go outside."

6

## B. The Jury Instruction Ruling and Verdict

Citing to *Dykes v. State*, 319 Md. 206 (1990), the trial judge found that Hollins had met his burden of producing "some evidence" that he acted in self-defense. Accordingly, the trial court instructed the jury on perfect and imperfect self-defense. In connection with the defense's theory that Alvarenga was the aggressor and started the fight, Hollins requested a special jury instruction about Alvarenga's propensity for violence citing Alvarenga's two prior assaults, as well as the three or four fights. The proposed instruction stated:

> You have heard testimony about Alexander Alvarenga's character trait for violence. You should consider this evidence with all the other evidence in this case. You may decide that it is likely that a person possessing a character trait for violence was the initial aggressor.

Defense counsel argued that the instruction met the requirements under Maryland Rule 5-404(a)(2)(B) and was supported by the evidence. The trial judge rejected Hollins's special jury instruction:

> I understand the reason for the request for the instruction, but . . . it is obviously [] a nonpattern instruction that's requested. . . . But I don't think it would be appropriate to instruct the jury on the propensity for violence when there is no – I understand you were tracking the character instruction . . . there is not [] a pattern instruction regarding someone's propensity for violence.
>
> So I am not going to instruct – give the requested nonpattern instruction on Mr. Alvarenga's propensity for violence. Counsel is free to argue that in this case.

The jury acquitted Hollins of attempted first-degree murder and first-degree assault but convicted him of second-degree assault. The court sentenced Hollins to ten years'

imprisonment, with two years suspended, and imposed five years' probation upon release. Hollins noted a timely appeal to the Appellate Court of Maryland.

## C. The Appellate Court of Maryland Decision

A divided panel of the Appellate Court of Maryland affirmed Hollins's conviction. *Hollins*, 2023 WL 8641392, at *2. Pertaining to the circuit court's refusal to give Hollins's requested jury instruction, the Appellate Court agreed with Hollins that the circuit court erred in failing to provide it on the basis that it was not a pattern instruction. *Id*. at *10. Nevertheless, the majority upheld the circuit court's refusal to give the instruction because it concluded that the evidence did not support the instruction. *Id*. The majority noted that it was required to "independently determine whether the requesting party 'produced [the] minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired.'" *Id*. at *10 (alternation in original) (quoting *Bazzle v. State*, 426 Md. 541, 550 (2012)).

In connection with its independent review, the majority summarized the evidence upon which Hollins relied in requesting the special instruction:

> Alvarenga's two second-degree assault convictions, his testimony that he had been in three or four fights in the past, his statement that "everybody fights," and Hollins' testimony that Alvarenga asked him to step outside and fight "like men do."

*Id*. at *10. Evaluating this evidence, the majority concluded that Hollins failed to produce sufficient evidence to generate the instruction. On the last piece of evidence—Hollins's testimony that Alvarenga asked him to step outside and fight "like men do"—the majority

8

noted that it was "based wholly on Hollins's uncorroborated testimony." *Id.* The majority

observed that "[t]he other incidents alluded to generalized conduct ('everybody fights')."

*Id.* Moreover, the majority reasoned, "Hollins did not testify he knew Alvarenga had a

propensity for violence[,]" observing that "[h]e called no witnesses who could corroborate

the same." *Id.*

> The majority concluded:

> Hollins attempts to cobble together the specter of Alvarenga's violent
> character based on events that happened years before and of which Hollins
> knew nothing about. Further, the two second-degree assault convictions are
> not legally crimes of violence. . . . Furthermore, the assaults were not
> themselves violent acts, as the first was hitting a police car and the second
> was spitting on a police officer's leg. To be sure, both incidents were utterly
> disrespectful of law enforcement and were technically assaults. These acts,
> however, hardly constitute the kind of violence necessary to generate an
> instruction concerning Alvarenga's propensity for violence.

*Id.* Accordingly, notwithstanding the circuit court's erroneous legal reasoning, the

majority concluded that the circuit court's decision was correct because Hollins failed to

generate sufficient evidence to support the instruction.

In her dissent, Judge Irma Raker disagreed with the majority's conclusion that

Hollins had failed to present "some evidence" that Alvarenga had a character trait for

violence. *Id.* at *13 (Raker, J., dissenting). The dissent pointed out that Alvarenga: (1)

admitted that he had been in three or four fights in the past; (2) believes that everybody

fights; and (3) had two second-degree assault convictions. *Id.* The dissent also noted that

Hollins testified that Alvarenga asked him to step outside and fight "like men do."

According to the dissent, although the evidence was "perhaps underwhelming," it was

9

nonetheless "*some* evidence of a propensity for violence, and meets the low bar required."

*Id.*

## II

## Standard of Review

In a criminal jury trial, the trial court "may, and at the request of a party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding." Md. Rule 4-325(c). A trial judge is required to give instructions on the law. These types of instructions "may cover such things as the burden of proof, presumption of innocence, and the elements of the crimes charged." *Harris v. State*, 458 Md. 370, 405 (2018). "However, instructions as to facts and factual inferences are normally *not* required." *Id.* (citing *Patterson v. State*, 356 Md. 677, 684 (1999)). For example, in *Harris*, we explained that a "missing witness instruction" concerned "an inference to be drawn from the evidence—or lack thereof—" and therefore, a trial court has discretion *not to give* the instruction "even if a party requests" it "and the necessary predicate for such an instruction has been established." *Id*. at 405-06 (citing *Robinson v. State*, 315 Md. 309, 319 n.7 (1989)).

In *Patterson*, we applied these principles when considering a defendant's request for a missing evidence instruction that would have permitted the jury to infer that, had the missing evidence been produced at trial, it would have been unfavorable to the State. 356 Md. at 682. We held that the trial court did not err by refusing to give this missing evidence instruction. We explained that instructions that relate to evidentiary inferences are fundamentally different than instructions that deal with the elements of a crime, elements

of an affirmative defense, or certain legal presumptions (such as a presumption of innocence):

> Because most evidentiary inferences are questions of fact, not questions of law, missing evidence instructions can be distinguished from instructions on the elements of the crime that a defendant is charged with, instructions on the affirmative defenses that a defendant may utilize, and from evidentiary presumptions that the law recognizes but, without an instruction, a jury would not recognize. Elements, affirmative defenses and certain presumptions relate to the requirement that a party meet a burden of proof that is set by a legal standard. A trial judge must give such an instruction if the evidence generates the right to it because it sets the legal guidelines for the jury to act effectively as the trier of fact. *An evidentiary inference . . . however, is not based on a legal standard but on the individual facts from which inferences can be drawn and, in many instances, several inferences may be made from the same set of facts.* A determination as to the presence of such inferences does not normally support a jury instruction. While supported instructions in respect to matters of law are required upon request, instructions as to evidentiary inferences normally are not.

*Id.* at 684-85 (emphasis added); *see also Janey v. State*, 166 Md. App. 645, 654 (2006) ("In contrast to the judge's duty to instruct the jury as to the applicable law . . . there is generally no duty for a trial court to give instructions that emphasize particular facts in evidence."). Finally, we note that a trial court has no discretion to give an inferential instruction where the facts do not support the inference. *See Harris*, 458 Md. at 406; *Robinson*, 315 Md. at 319 n.7.

In this case, Hollins's requested jury instruction—that Alvarenga has a "character trait for violence" from which the jury could infer that he was the initial aggressor—is the type of inferential instruction that is not required to be given *even if* generated by the evidence. Here, we must determine whether there was "some evidence" in the record to generate the instruction, and if so, whether the circuit court abused its discretion by failing

11

to exercise its discretion. Accordingly, although we review a judge's decision to accept or reject a proposed jury instruction pertaining to inferences to be drawn from the evidence for abuse of discretion, *see Harris*, 458 Md. at 405; *Hall v. State*, 437 Md. 534, 539 (2014), "[t]he threshold determination of whether the evidence is sufficient to generate the desired instruction is a question of law" and thus is reviewed de novo, *Bazzle*, 426 Md. at 550 (quoting *Dishman v. State*, 352 Md. 279, 292-93 (1998)). In determining whether there was "some evidence" to support the instruction, we review the evidence in the light most favorable to the accused. *See Dykes*, 319 Md. at 221-22.

## III

### Discussion

At the outset, we note that the State agrees with Hollins that the trial court's reason for failing to give the requested jury instruction—because it was not a pattern jury instruction—constituted an abuse of discretion. We also agree. *See Fleming v. State*, 373 Md. 426, 432 (2003) (explaining that a "trial judge is required to give a requested instruction that correctly states the applicable law and that has not been fairly covered in other instructions"); *see also Six Flags Am., L.P. v. Gonzalez-Perdomo*, 248 Md. App. 569, 586-92 (2020) (concluding that a trial judge erred by failing to give a requested non-pattern jury instruction that was a correct statement of the law and applicable to the facts of the case). Given that the court's rationale for failing to give an instruction was an abuse of discretion, we turn to whether there was some evidence in the record to support the requested instruction.

12

## A. The "Some Evidence Standard"

In connection with our de novo review of the evidence, we must determine whether Hollins generated "some evidence" to permit a jury to find that Alvarenga had a propensity for violence thereby providing the trial judge with a basis for giving the instruction. *See Arthur v. State*, 420 Md. 512, 525-26 (2011). As we explained in *Dishman*:

> The determination of whether an instruction must be given turns on whether there is any evidence in the case that supports the instruction . . . The task of this Court on review is to determine whether the criminal defendant produced that minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired.

352 Md. 279, 292 (1998); *see also Rainey v. State*, 480 Md. 230, 261 (2022) (holding that a defendant's major change in appearance five weeks after the shooting and his infrequent visits to the neighborhood thereafter "overcome[] the minimal threshold of 'some evidence' to establish . . . a desire to conceal evidence."); *Bazzle*, 426 Md. at 555 ("A defendant is not entitled to an instruction on voluntary intoxication unless he can point to 'some evidence' that 'would allow a jury to rationally conclude' that his intoxication made him incapable of 'form[ing] the intent necessary to constitute the crime[.]'") (alteration in original) (footnotes and citation omitted).

The "some evidence" standard is a "fairly low hurdle for a defendant." *Arthur*, 420 Md. at 526; *see also Bazzle*, 426 Md. at 551 (explaining that the "some evidence" threshold "is low"). In *Dykes*, we explained the low threshold as follows:

> *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says—"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond a reasonable doubt"

or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant.

319 Md. at 216-17.

Hollins argues that the majority and dissenting opinions of the Appellate Court reveal a conflict in our case law over the quantum of evidence that a party must produce to generate an instruction. Hollins asserts that there are "essential differences" between the "prima facie standard" and the "some evidence" standard and asks this Court to resolve the conflict. Hollins's concerns are misplaced. We have consistently used the term "prima facie standard" to describe the quantity of evidence sufficient to raise a jury issue regarding an asserted defense, or pertinent theory, *i.e.*, when in a trial judge's assessment, the defendant has provided enough evidence to instruct the jury on an asserted defense or theory. *See Dishman*, 352 Md. at 292 (citing *State v. Evans*, 278 Md. 197, 208 (1976)); *Rainey*, 480 Md. at 255; *Bazzle*, 426 Md. at 550-51; *Arthur*, 420 Md. at 525-26. Such evidence can be slight and even overwhelmed by the opposing evidence. *See Dishman*, 352 Md. at 293. As long as the relied-upon evidence, if believed by a rational juror, supports the proponent's claim, the proponent has met the burden of showing that the requested jury instruction applies to the facts of the case. *See, e.g., Lee v. State*, 193 Md. App. 45, 55 (2010) (noting that the defendant "has the burden of initially producing some evidence on the issue of mitigation or self-defense (or relying upon evidence produced by the State) sufficient to give rise to a jury issue with respect to these defenses.") (internal quotation marks omitted).

With this standard in mind, we turn to the evidence presented in this case.

14

## B. Evidence of Alvarenga's Propensity for Violence

Hollins argues that there was sufficient evidence presented of Alvarenga's propensity for violence to satisfy the low threshold of "some evidence," thereby generating his requested instruction. Specifically, Hollins notes that after the State introduced Alvarenga's two assault convictions, he elicited testimony from Alvarenga about his belief that "everyone" gets in fights and his involvement in three or four other fights. Hollins also presented evidence that Alvarenga was angry at him about Hollins's comment on his Spanish dialect to a female co-worker and that Alvarenga threw the first punch. Hollins also presented evidence of Alvarenga's recorded statement to law enforcement that he was going to fight Hollins, "like, one-on-one, you know, like men do." Ware, the combatants' co-worker, partially corroborated Hollins's account by testifying that Alvarenga was unfriendly during the night of the fight and asked Hollins if he was "ready to go outside." Hollins argues that, under the low threshold of "some evidence," this was sufficient to generate the instruction that Alvarenga had a propensity for violence and that the jury could therefore reasonably infer that Alvarenga was the initial aggressor.

The State contends that, even considering the evidence in the light most favorable to Hollins, it does not support a reasonable inference that Alvarenga had a character trait for violence. Focusing on Alvarenga's second-degree assault convictions, the State asserts that, when one examines the underlying facts of the convictions—slapping a police car and spitting on an officer's leg—although the conduct is disrespectful, it is not intended or likely to cause injury, and therefore does not suggest a propensity for violence. Nor, according to the State, is the fact that Alvarenga had "been involved" in other fights

indicative of violent character, because there was no evidence about how these fights began or who started them. The State argues that without evidence of Alvarenga's role in those fights, they are not probative of a propensity for violence.[3] Finally, the State agrees with the Appellate Court that Alvarenga's comment that "everybody fights" "alluded to generalized conduct" and did not describe Alvarenga's own behavior.

Considering the evidence in the light most favorable to Hollins, we hold that there was "some evidence" generated that Alvarenga had a character trait for violence, which would have supported the requested instruction if the circuit court was inclined to give it in the exercise of the court's discretion. Even if we exclude the second-degree assaults as not reflecting a propensity for violence (given that their underlying facts involved Alvarenga smacking a police car with a hand and spitting on a police officer's leg) there was nonetheless "some evidence" that Alvarenga had a character trait for violence and therefore generated the instruction. Specifically, Alvarenga (1) testified that he had been involved in "three or four fights" in the past; (2) made statements reflecting a belief that being involved in violent fights is a common occurrence; and (3) told law enforcement that he was going to fight Hollins "one-on-one, you know, like men do." A jury could determine, based upon this evidence, that Alvarenga has a propensity for violence—that

---

[3] The State agrees with Hollins that, contrary to the Appellate Court's rationale, a defendant's uncorroborated testimony can provide enough evidence to support a jury instruction. We also agree. As we noted in *Dykes*, "[t]he source of the evidence is immaterial; it may emanate solely from the defendant." 319 Md. at 217. Thus, it does not matter where the evidence showing Alvarenga's violent past emanated from, and no corroboration of Hollins's claim that Alvarenga challenged him to a fight was necessary. In any event, Ware's testimony provides some corroboration that Alvarenga challenged Hollins to a fight.

he has been involved in several fights in the past and believes that it is common for people to fight "like men do."

As discussed above, the "some evidence" standard is a "fairly low hurdle[,]" and "calls for no more than what it says—'some,' as that word is understood in common, everyday usage." *Arthur*, 420 Md. at 526 (internal quotation marks omitted) (quoting *State v. Martin*, 329 Md. 351, 359 (1993)). It does not matter which party generated the evidence, whether it is corroborated, or even if it is overwhelmed by other evidence to the contrary. Applying this standard, we hold that there was "some evidence" presented that Alvarenga had a character trait for violence from which a jury could rationally conclude that he was the initial aggressor. As such, the circuit court was required to exercise its discretion to consider whether to give the instruction.

## C. The Circuit Court Abused its Discretion When it Denied Hollins's Requested Jury Instruction Simply Because It Was Not a Pattern Instruction.

"It is well settled that a trial judge who encounters a matter that falls within the realm of judicial discretion *must* exercise his or her discretion in ruling on the matter." *Gunning v. State*, 347 Md. 332, 351 (1997) (emphasis in the original) (citing *Colter v. State*, 297 Md. 423, 426 (1983)). We have stated that "[j]udicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *In re Don Mc.*, 344 Md. 194, 201 (1996) (quoting *State ex rel. Carroll v. Junker*, 79 Wash. 2d 12, 26 (1971)). That exercise of discretion must be clear from the record. *See Nelson v. State*, 315 Md. 62, 70 (1989). The court's failure to

17

fulfill this function is an error that "ordinarily requires reversal." *Maus v. State*, 311 Md. 85, 108 (1987). "If the judge has discretion, he [or she] must use it and the record must show that he [or she] used it." *Nelson*, 315 Md. at 70 (holding it was an abuse of discretion for a trial judge to refuse to order a requested presentence investigation based on the costs of such an investigation and the judge's personal belief that there was no need for it).

In *Gunning v. State*, we held that a trial judge abused his discretion by refusing to give a requested eyewitness identification instruction because the denial of the requested instruction "was not grounded on the exercise of judicial discretion; rather, the record in each case is clear that the denial was based on the application of a uniform policy, a policy which arose from the judge's personal belief that identification instructions are not 'appropriate.'" 347 Md. at 351. We explained that "a court errs when it attempts to resolve discretionary matters by the application of a uniform rule, without regard to the particulars of the individual case." *Id.* at 352. Trial judges should "examine the unique circumstances of each case before rejecting a requested . . . instruction." *Id.* at 350. We also noted that requested instructions should "at least [be] given careful consideration" and "arbitrarily rejecting them as always inappropriate was an abuse of discretion." *Id.* at 353-54.

In *Janey v. State*, the intermediate appellate court held that simply because a particular instruction does not appear in the Maryland Pattern Jury Instructions does not "serve as the basis for an arbitrary refusal to consider granting such an instruction." 166 Md. App. at 666. The court observed that just as "the trial judge in *Gunning* abused his discretion by adopting a predetermined position of never giving the requested instruction,

18

it would be an abuse of discretion for a trial judge to apply a uniform policy of rejecting all requested instructions that are not covered by some pattern instruction." *Id.*

In this case, Hollins's requested jury instruction—that Alvarenga has a propensity for violence from which the jury could infer that he was the aggressor—is the type of inferential instruction that is not required to be given even if generated by the evidence. Nevertheless, where a party requests a jury instruction in a criminal case, the trial judge must evaluate whether the instruction is applicable to the facts of the case and otherwise appropriate, being mindful that "[t]he main purpose of a jury instruction is to aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict." *Chambers v. State*, 337 Md. 44, 48 (1994). The decision whether to give an instruction that calls for an evidentiary inference lies within the sound discretion of the trial court based on the unique circumstances of each case.

The record does not reflect any consideration of Hollins's proposed special jury instruction, let alone "careful" consideration. The trial judge simply concluded that because the requested instruction was not a pattern instruction, she would not give it. Summarily rejecting an instruction request because it is non-pattern is akin to adopting a uniform policy, like the one we rejected in *Gunning*, as both completely bypass a judge's obligation to exercise their discretion and to take the matter under consideration. Had the trial judge exercised her discretion in this case, she may have determined that it was not appropriate to give the requested instruction for a variety of reasons. In some cases, especially cases where there are conflicting narratives, providing detailed instructions on issues such as witness credibility, self-defense, or the burden of proof may adequately

encompass the subject matter of a requested instruction on an evidentiary inference. In some instances, even where there is a sufficient evidentiary basis to give an inferential instruction, the judge might conclude that doing so could confuse the jury or improperly influence it by putting the court's imprimatur on a particular factual inference. In such instances, it is appropriate to allow the parties to address the issue in closing arguments without instructing the jury on it. *See Davis v. State*, 333 Md. 27, 52 (1993). Still, in other cases, because of the centrality of the victim's alleged propensity for violence, a separate special instruction might be helpful to the jury. It is up to the trial judge to examine the unique circumstances of each case to base a decision to accept or reject the proposed instruction.

In light of the foregoing, we hold that a trial judge's failure to exercise *any* judicial discretion regarding the consideration of a proposed jury instruction constitutes an abuse of discretion even where, as here, the trial judge is not obligated to give such an instruction. The trial court abused its discretion in this case and the proper remedy is a new trial.[4] At retrial, if some evidence again is introduced that supports giving an instruction concerning Alvarenga's alleged propensity for violence, the trial court shall consider whether to give such an instruction.

---

[4] The State has not argued that any error in failing to give the requested instruction was harmless beyond a reasonable doubt.

20

## IV

## Conclusion

In summary, we hold that:

(1) The circuit court abused its discretion in refusing to give Hollins's requested jury instruction because it was not a pattern jury instruction.

(2) Based upon our independent review of the evidence, there was some evidence generated that Alvarenga had a character trait for violence and a jury could, therefore, reasonably infer that he was the initial aggressor.

(3) Because the evidence generated the instruction, the circuit court was required to exercise its discretion to consider whether to give the inferential instruction.

(4) The circuit court abused its discretion in failing to do so.

We, therefore, reverse the judgment of the Appellate Court and remand this case for a new trial. At the retrial, if some evidence is introduced concerning Alvarenga's propensity for violence, it is up to the trial court, in the exercise of its discretion, to determine whether to give the proposed jury instruction.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR A NEW TRIAL; COSTS TO BE PAID BY MONTGOMERY COUNTY.**

21